# EXHIBIT 1

**TO
THE DECLARATION OF NEIL A. GOTEINER IN
SUPPORT OF DASTIME GROUP LIMITED'S AND
KONSTANTIN GRIGORISHIN'S PETITION TO
CONFIRM FINAL ARBITRATION**

Hon. Rebecca J. Westerfield (Ret.)
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111
Telephone: (415) 982-5267
Fax: (415) 982-5287

ARBITRATOR


## JAMS ARBITRATION

| | |
|---|---|
| MOONVALE INVESTMENTS LIMITED, a British Virgin Islands Company | JAMS Ref. No. 1100075691 |
| **Claimant,** | **CORRECTED FINAL AWARD** |
| vs. | **Confidential Subject to Protective Orders** |
| DASTIME GROUP LIMITED, a British Virgin Islands Company, KONSTANTIN GRIGORISHIN, an individual | |
| **Respondents.** | |
| DASTIME GROUP LIMITED, a British Virgin Islands Company, KONSTANTIN GRIGORISHIN, an individual | |
| **Counterclaimants,** | |
| vs. | |
| MOONVALE INVESTMENTS LIMITED, a British Virgin Islands Company | |
| **Counter-Respondent.** | |
| DASTIME GROUP LIMITED, a British Virgin Islands Company, KONSTANTIN GRIGORISHIN, an individual | |
| **Crossclaimants,** | |
| vs. | |
| PETER KIRITCHENKO, an individual | |
| **Cross-Respondent.** | |

## Parties and Counsel[1]

### Counsel for Claimant/Counter-Respondent ("Claimant")

Aleksandr Gruzman, Esq.
Law Offices of Aleksandr Gruzman
7506 Jumilla Avenue
Winnetka, CA 91316
Telephone:  818-590-6688
Facsimile:  866-475-5442
E-Mail:  agruzman07@gmail.com

Alexander Lebedev, Esq.
69 Chertanovskaya 66, Building 2
Moscow

Dmitry Buryak, Esq.
4-V Volodymyrskiy Uzvis
Ukraine, 01110

Marina Khoryakova, Esq.
E-Mail:  Marina.Khoryakova@atlas-corporate.com

### Claimant/Counter-Respondent

MOONVALE INVESTMENTS LIMITED

### Counsel for Respondents/Counterclaimants/Crossclaimants ("Respondents")

Evgeny Raschevsky, Esq.
Anton Berezin, Esq.
Egorov Puginsky Afanasiev & Partners
40/5 Bol. Ordynka Street
Moscow, 119017
Telephone:  +7 (495) 935-8010
Facsimile:  +7 (495) 935 8011
E-Mail:  evgeny_raschevsky@epam.ru
E-Mail:  anton_Berezin@epam.ru

Andrew Mac, Esq.
EPAP USA LLC
1700 H Street, NW # 62
Washington, D.C.  20006
Telephone:  202-507-5762
Facsimile:  202-507-5601
E-Mail:  andrew_mac@epamusa.com

---

[1] This Final Award incorporates the facts, procedural history and legal analysis of the First and Second Interim Awards in its entirety.

Neil A. Goteiner, Esq.
C. Brandon Wisoff, Esq.
Kelly M. Matayoshi, Esq.
Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
Telephone: 415-954-4400
Facsimile:  415-954-4480
E-Mail:  ngoteiner@fbm.com
E-Mail:  bwisoff@fbm.com
E-Mail:  kmatayoshi@fbm.com

**Respondents/Counterclaimants/Crossclaimants**

DASTIME GROUP LIMITED

KONSTANTIN GRIGORISHIN


**Counsel for Cross-Respondent**
Stan Roman, Esq.
Tracy Clements, Esq.
Keller Sloan Roman & Holland LLP
555 Montgomery Street, 17th Floor
San Francisco, CA  94111
Telephone:  415-249-8330
Facsimile:  415-249-8333
E-Mail:  sroman@ksrh.com
E-Mail:  tclements@ksrh.com

**Cross-Respondent**

PETER KIRITCHENKO


**Certified Reporter Services**
Nogara Reporting Service
5 Third Street, Suite 415
San Francisco, CA  94103

**Certified Court Interpreter**
Maria Masha Entehevitch
Judicial Council of CA ID No. 301144

**Arbitrator**

The parties have appointed as sole Arbitrator:

Hon. Rebecca J. Westerfield, (Ret.)
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111
Tel. (415) 982-5267
Fax. (415) 982-5287

**Case Manager**

Patricia Usak
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111
Tel. (415) 774-2616
Fax. (415) 982-5287
E-mail: pusak@jamsadr.com

**Place of Arbitration**: JAMS, Two Embarcadero Center, Suite 1500, San Francisco, CA

**Date of Initial Hearing**:  December 7 and 8, 2015

**Attendees**: Aleksandr Gruzman, Esq., Stan Roman, Esq., Tracy Clements, Esq., Dmitry Buryak, Esq., Marina Khoryakova, Esq., Elena Sarapulova (Dastime), Maxim Markov (Dastime), Andrew Mac, Esq., Anton Berezin, Esq., Christoffer Lee, Esq., C. Brandon Wisoff, Esq., Kelly M. Matayoshi, Esq., Neil A. Goteiner, Esq.

**Witnesses:**  Peter Kiritchenko, Aleksander Vartanyan, Stan Roman

**Respondents' Exhibits**:  Exh. 1-28 and supporting declarations to the Respondents'

Motion for Summary Disposition based on Statute of Limitations Defense, and Claimants'

Opposition.

**Date of Oral Argument:**  July 6, 2016

**Agreement to Arbitrate:**  Arbitration clause is contained in the contract between Peter

Kiritchenko and Dastime Group Limited dated June 28, 2006 ("2006 Agreement").  Ex. 3.

Paragraph 10 of this Agreement provides the jurisdiction for this arbitration.  Specifically,

paragraph 10 states: "[a]ny dispute between the Parties arising out of or relating to this Contract

shall be resolved by binding arbitration.  This arbitration clause shall be deemed to be an

agreement independent of the other terms of this Contract.  Any arbitration shall be conducted in

San Francisco, California before a single arbitrator pursuant to the rules of the Judicial

Arbitration and Mediation Services ('JAMS'), and the award or other final determination of the

arbitrator shall be final and binding upon the Parties."

   **Applicable Law and Rules:**  The applicable substantive law is the law of the State of

California. The JAMS International Rules ("Rules") shall apply to this proceeding (Case

Management Order ("CMO") No. 2 dated May 5, 2014).[2]

---

[2] As noted, *supra*, the parties' 2006 agreement specified that any dispute pertaining to the agreement would be heard before a single arbitrator at JAMS. While that agreement did not specify whether the JAMS Comprehensive or the JAMS International Rules would apply, on February 12, 2014, JAMS administration determined, over Moonvale's and Kiritchenko's objection, that this dispute is governed by the JAMS International Rules. The undersigned subsequently reconfirmed that determination in Case Management Order No. 2, dated May 5, 2014.

These findings were (and continue to be) based on the fact that Rule 1.1 of the JAMS International Rules states that: "[w]here parties have agreed in writing to arbitrate disputes under these International Arbitration Rules . . . *or have provided for arbitration of an international dispute by JAMS* or JAMS International, the arbitration will take place in accordance with these Rules, as in effect at the date of commencement of the arbitration subject to whatever modifications the parties may adopt in writing." JAMS International Rule, Rule 1.1. These findings also were (and continue to be) based on the fact that JAMS International Rule 1.4 states: "Arbitration will be deemed to be 'international' under the Rules if, at the time of the making of their agreement, the parties are located in different states or if a substantial amount of the transaction(s) or occurrence(s) that gave rise to the dispute took place in different states." JAMS International Rules, Rule 1.4. This is exactly what Moonvale pleaded in its Statement of Claim. For example, in its Statement of Claim Moonvale alleged: (1) Kiritchenko was in the United States at the time of the 2006 Contract; (2) Kiritchenko could not travel to Ukraine to verify Grigorishin's alleged statements made to him in connection with his decision to enter the 2006 Contract; (3) Grigorishin is a Ukrainian businessman and owner of Dastime; (4) Dastime is a British Virgin Islands ("BVI") company; and (5) there is a dispute about ownership of Ukrainian assets held by BVI-based companies, as well as disputes over the meaning of earlier agreements executed in Dusseldorf, Germany and elsewhere concerning Ukrainian assets and BVI holding companies.  Thus, because Moonvale itself pleaded that the parties were in different states at the time of the 2006 contract (Kiritchenko in the United States, Grigorishin in Ukraine, and Dastime in the BVI) and that a substantial amount of the transactions or occurrences giving rise to the dispute took place in different states (Ukraine, BVI, Germany), the JAMS International Rules apply to this arbitration.

It should be noted that, while both Moonvale and Kiritchenko initially objected to the application of the JAMS International Rules to these proceedings, both parties ultimately fully participated in this arbitration, often times citing to and relying upon these rules, and neither party went to court to challenge JAMS's or the undersigned's determination that the JAMS International Rules apply.

Corrected Final Award - 1100075691

**<u>Procedural Statement</u>:**

Claimant filed its Demand for Arbitration and Statement of Claims with JAMS on October 21, 2013.

Dastime filed a Demand for Arbitration and Crossclaim against Peter Kiritchenko on March 14, 2014.

Respondents filed an Amended Response, Counterclaim and Crossclaim against Cross-Respondent, Peter Kiritchenko on July 7, 2014.

The arbitration hearing was initially scheduled to begin April 13, 2015.  By joint motion of Counsel for all the parties, the matter was continued to October 26 to November 13, 2015.

In August 2015, Morrison and Forester law firm withdrew as lead counsel for Claimant and was substituted by Aleksandr Gruzman, who had previously made appearances as counsel in the matter and had been involved in the proceedings as counsel to Claimant.  The hearing was rescheduled to begin March 26, 2016.

JAMS International Rule 20 states:

Article 20.  Conduct of the Arbitration

20.1  Subject to these rules, the Tribunal may conduct the arbitration in whatever manner it considers appropriate, provided that the parties are treated with equality and that each party has the right to be heard and is given a reasonable opportunity to present its case. The Tribunal, exercising its discretion, will conduct the proceedings with a view to expediting the resolution of the dispute.

20.2  The Tribunal may decide whether the parties will present any written statements in addition to statements of claims and counterclaims and statements of defense, and it will fix the periods of time for submitting any such statements.

20.3  The Tribunal may in its discretion direct the order of proof, bifurcate proceedings, exclude cumulative or irrelevant testimony or other evidence and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

Pursuant to that rule, on September 9, 2015, the Arbitrator granted Respondents' Motion for an Evidentiary Hearing solely on the issue of their affirmative defense based on the statute of limitations.  (CMO12).  The evidentiary hearing was held on December 7 and 8, 2015 on Respondents' Motion to Summarily Adjudicate Respondents' Statute of Limitations Defense and to dismiss Claimant's claims relating to:  1) Intentional misrepresentation, 2) Fraudulent inducement and 3) Concealment and negligent misrepresentation.  Over Claimant's objection, Respondents did not produce and the Arbitrator did not order the appearance of two individuals – Konstantin Grigorishin and Igor Kuida – at the hearing.  Final closing briefs were filed on January 11, 2016.  By agreement of counsel on January 20, 2015, at which time the parties had the opportunity to present witnesses and proposed argument, the arbitration in chief was continued to June 13-24, 2016 pending a ruling by the Arbitrator on the statute of limitations defense.

Claimant contends that Respondents' refusal to present the testimony of Grigorishin and Kuida as witnesses "is direct concealment and interference with Claimant's ability to produce material evidence on the delayed discovery of the claims by . . . Kiritchenko." (Cl. Submission on SOL issue, pp. 16-17.) However, since the Arbitrator has accepted as true for purposes of this motion those facts alleged by Claimant and Peter Kiritchenko with regard to Kuida's and Grigorishin's actions and representations to Kiritchenko before and while entering into the 2006 Agreement, Claimant was not prejudiced by its inability to cross-examine Kuida or Grigorishin at the December hearing.  Further, Claimant has neither identified nor proffered material evidence from Grigorishin or Kuida that would have further supported Claimant's claim that Kiritchenko reasonably relied upon the representations of Grigorishin and his agent, Kuida, or could not have discovered through reasonable investigation the injury of the misrepresentation.

Grigorishin's and Kuida's failure to testify and to deny or explain the misrepresentations made to Kiritchenko are already being interpreted against them in these proceedings. For purposes of this hearing, it has been assumed that the misrepresentations were made.

This matter was properly before the Arbitrator for Summary Disposition. As established in *Schlessinger v. Rosenfeld, Meyer & Susman* (1995) 40 Cal. App. 4th 1096, an arbitrator's obligation to hear evidence does not mean that the evidence must be orally presented or even that live testimony is required. *Id.* at 1105. Legally speaking the admission of evidence is to hear it, the court explained, and an arbitrator hears evidence by providing a legal hearing, that is, by affording an "opportunity to . . . present one's side of a case." (*Id.*) An arbitrator also hears a matter by "consider[ing] a motion upon presentation thereof by counsel." (*Id.*) A hearing does not necessarily include an opportunity to present live testimony or be subject to cross examination. (*Id.* at 1106) Specifically, the Court in *Schlessinger* stated: "While that portion of the Act [CA. Code Civ. Proc. 1282.2(d)] entitles a party to cross-examine witnesses *if* they appear at the hearing, it does not give a party an absolute right to present oral testimony in every case." *Id.* at 1106. [citation added] The parties in this arbitration were afforded a full and fair opportunity to present their respective positions.

An Interim Award was entered in this matter on March 14, 2016 dismissing the claims of Claimant, Moonvale, for intentional misrepresentation, fraudulent inducement, concealment and negligent misrepresentation. Hearing dates for all remaining claims, counterclaims and Cross-claims were reset for June 15-17, 2016. CMO 16.

By agreement of all counsel the hearing dates were subsequently vacated and the Respondents' counter and Cross-claims including claims of entitlement to attorney fees, other costs of arbitration and disgorgement were submitted to the Arbitrator on paper and

accompanying declarations and exhibits. CMO 17. Further, all counsel stipulated that all exhibits and declarations filed after the December 2015 hearing could also be considered as evidence by the Arbitrator. CMO 19.  All issues were fully briefed and presented.  All parties were given full opportunity to present all arguments and relevant evidence.  Oral argument was held on July 6, 2016 and counsel agreed that the Second Interim Award would be due September 12, 2016. The Second Interim Award was entered on September 6, 2016 after consideration of all post-hearing written statements and arguments presented during a telephonic conference on July 6, 2016. Prior to the entry of that award and in anticipation of the June hearing, Respondents had submitted in May 2016 declarations in support of Respondents' Petition for Attorneys' Fees and Costs. Claimant. Cross-Respondent objected to the Respondents' submission as being vague and insufficient and the Arbitrator permitted the Respondents to supplement their Petition which they timely filed on August 26, 2016. Claimant/Counter-Respondent per CMO 23 filed their responses on October 25, 2016 and Respondents timely filed their reply on December 14, 2016. Subsequently, filing of letter briefs was permitted addressing issues relating to the characterization of the award. The matter stood submitted for decision on January 5, 2017.

All proceedings, the Interim Award of March 14, 2016 and the Second Interim Award are subject to protective orders entered in this proceeding on May 1, 2014, December 10, 2014 (CMO Nos. 1 and 9 respectively) and again on December 4, 2015. CMO 9 protective order was further amended on May 4, 2016. Limited relief from those protective orders for the narrow purpose of Respondents' petitioning a court of competent jurisdiction to compel Vartanyan into arbitration was granted on August 30, 2016. CMO 22. Subsequently, an action was filed in United States District Court Northern District of California. Chief Magistrate Judge, Joseph Spero, on December 16, 2017, entered an order directing Respondents to "…file for entry of

default and motion for default judgment within thirty (30) days…" An updated case management conference statement in the matter is due March 10, 2017. Dastime Group v. Vartanyan, U.S.D.C. No. California 16-CV-05274-JCS.

Paragraph 8 (c) of the initial Protective Order stipulated to by all parties states that "This Order shall be incorporated into and made a part of the final award rendered by the Tribunal in this Arbitration. Further, the provisions of this Order shall remain in effect after the conclusion of this Arbitration, and the Arbitrator shall retain continuing jurisdiction to enforce such provisions." Pursuant to those terms, the Final Award is subject to the Protective Orders entered in the Arbitration and subject to the continuing jurisdiction of this Arbitrator.  On January 11, 2017, the Arbitrator also directed counsel to provide not later than January 25, 2017, exact wording of any protective orders to be incorporated into the Final Award.

A Final Award was issued on February 9, 2016. Pursuant to § 38.1 JAMS International Arbitration Rules & Procedures, Claimant, Respondents, and Cross- Respondent timely filed request for corrections of "…clerical, typographical or computational errors, or make an additional award as to claims presented but omitted from the award…." Cross- Respondent, Kiritchenko, was the last to file such request and did so on March 10, 2016. A telephonic conference was held on March 14, 2016 in which Tracey Clements, counsel for Cross-Respondent, Kelly Matsayoshi and Brandon Wisoff, counsel for Respondents, and Alexander Gruzman for Claimant participated. The Arbitrator considered all arguments of counsel and the following Corrected Final Award is hereby entered.

## FINDINGS OF FACT

On December 7 and 8, 2015, at the San Francisco office of JAMS, the undersigned Arbitrator held an evidentiary hearing on Respondents/Counterclaimants/Crossclaimants',

Dastime Group Limited ("Dastime") and Konstantin Grigorishin's ("Grigorishin") (collectively, "Respondents") statute of limitations defense.  According to Respondents, Claimant/Counter-respondent's, Moonvale Investments Limited's ("Moonvale" or "Claimant") efforts to set aside the contract that Dastime and Cross-Respondent Peter Kiritchenko ("Kiritchenko"), entered into on June 28, 2006 (the "2006 Agreement"), Ex. 3, were not timely filed.  Kiritchenko assigned all rights under the 2006 Agreement to Moonvale, a British Virgin Islands Co., which did not file its Demand for Arbitration and Statement of Claim until October 21, 2013[3].  Having waited seven (7) and one-half years to pursue Dastime and its principal, Konstantin Grigorishin, for purportedly fraudulently inducing Kiritchenko to enter into the 2006 Agreement by concealing and misrepresenting material facts pertaining to the value of the parties' Joint Business[4] and Kiritchenko's interest in that business, Respondents assert that Moonvale's claims are well beyond the applicable statute of limitations.  Moonvale contends, however, that under the delayed discovery rule its fraudulent concealment claim did not accrue until December, 2010 when Kiritchenko purportedly first learned of Grigorishin's fraud and misrepresentation about the value of assets held by Dastime.  As such, Moonvale avers its intentional misrepresentation, fraudulent inducement, concealment and negligent misrepresentation claims are not barred by the applicable statute of limitations.  Further, Moonvale has asserted, although not specifically pled, equitable estoppel.  (Claimant's Post-Hearing Submission at pp. 4-12)

Kiritchenko, as Cross-Respondent, specifically alleged equitable estoppel as an affirmative defense in his Answer to Respondents' Cross-claims (Cross-Respondents' Answer at

---

[3] Whether Kiritchenko had the ability to make such an assignment was disputed but was not the subject of the dispositive motion before the Arbitrator on the Statute of Limitation issue.
[4] "Joint Business" is a term used by counsel in these proceedings to refer to the "Transferred Assets" as defined in the 2006 Agreement, Ex 3. and various unidentified businesses which may also have been improperly transferred by Grigorishin prior to the Agreement.

4) and Moonvale fully pled facts to support its estoppel defense. Thus, the issue of whether equitable estoppel precludes the Respondents from raising a statute of limitations defense is properly before the Arbitrator.

As noted, *supra*, the undersigned held a two-day evidentiary hearing on this issue. At that hearing, witnesses testified under oath. Counsel for all parties had full opportunity to examine the witnesses; declarations and other written testimony from Kiritchenko and Alexander Vartanyan ("Vartanyan") were also considered.

The Arbitrator's reasoning in the First Interim Award was based solely on the facts that were set forth in the parties' declarations and other submissions and in the sworn testimony of the witnesses at the hearing. Moreover, the Arbitrator viewed these facts in the light most favorable to Claimant, and, at least for purposes of Respondents' Motion for Summary Disposition, the Arbitrator assumed and accepted as true facts set forth by Claimant regarding the content and fact of misrepresentation from Grigorishin and his agent, Kuida. For purposes of the Second Interim Award, the Arbitrator has also considered post hearing declarations and exhibits. CMO 19.

Starting in the mid-1990s, the Ukrainian government engaged in a process of privatization of many state-owned companies. Ownership of state-owned assets was shifted to private ownership through various processes. Some previously state-owned companies were sold on the stock market. Others were sold through a competitive "tender" process, through which investors would submit bids for purchase. (Vartanyan Decl., ¶2.)

Many of these tenders, particularly in connection with privatization of large and medium-sized enterprises, required investors to commit to future investment obligations. Buyers often committed to make large future investments in the companies in order to win the tender. During

such tenders, investors offering the greatest amount of investment into the privatized company were declared the winners.  In addition to cash sales, the shares of privatized companies could be purchased at par value in exchange for certificates or vouchers which were distributed to the privatized companies' workers and management. In some cases, ownership rights were transferred to employees and managers for free. (*Id.*)  In 1995, Grigorishin, a Ukrainian born Russian citizen and businessman now living in Moscow, Russia, and Vartanyan, a Russian businessman who worked as director between 1995 to 2002 in various companies controlled by Grigorishin, founded two intermediary companies that would help in privatization deals in Ukraine. (Written Direct Testimony of Vartanyan, ¶3.) One of those companies, Liberty Market, was a brokerage that helped with purchasing shares. Another company was a registrar company, United Registry, whose function was to register deals, shares, and owners, hold shareholder meetings, and protect shareholder rights. (*Id.*)

In late 1995, Kiritchenko engaged in some barter transactions with Grigorishin, whom he understood to be mainly doing business in Ukraine trading in electricity from nuclear power plants. (Written Direct Testimony of Kiritchenko, ¶6.) Then, in approximately 1996, Grigorishin and Kiritchenko decided to invest together in the privatization of Ukrainian companies. (*Id.*) These companies presented attractive investment opportunities to Grigorishin and Kiritchenko because, in the absence of an established market economy to determine the value of the businesses, they could sometimes be bought for much less than their post-privatization value. (*Id.*) Kiritchenko was going to provide most of the capital for these investments, and he and Grigorishin agreed that Kiritchenko would be repaid his capital investment, and they would then split all profits. (*Id.*)

Kiritchenko and Grigorishin began investing in 1996. The two shared ownership of the holding companies that were used to make Joint Business investments. (*Id.*, ¶7.) Initially, Kiritchenko owned 51% of these holding companies and Grigorishin 49%. That was later changed to 50-50. (*Id.*)

From 1995 through 2002 Vartanyan acted as Managing Director of Kiritchenko's and Grigorishin's Joint Business. (Vartanyan Written Direct Testimony, ¶4; Vartanyan Decl., ¶1.) Vartanyan was very knowledgeable in investing into Ukrainian privatization. (*Id.*, ¶¶2-3.) Kiritchenko did not know Vartanyan prior to meeting him in 1996. But at a meeting that occurred in 1996 among Kiritchenko, Grigorishin, Vartanyan and Igor Kuida, Grigorishin's business partner (also referred to as "Kuyda"), Vartanyan gave both Kiritchenko and Grigorishin the bearer share certificates[5] from the newly incorporated businesses. (*Id.*, ¶8.) Vartanyan had incorporated several companies for the Joint Business in the British Virgin Islands to act as holding companies for the Joint Business. (Vartanyan Decl., ¶4.)

The activities of the Joint Business were concentrated on investment in formerly state-owned Ukrainian energy, metallurgy and heavy machinery manufacturing companies that had undergone or were undergoing privatization. (Written Direct Testimony of Kiritchenko, ¶9.)  The businesses included *oblenergos*, energy distribution companies serving millions of clients. When Kiritchenko and Vartanyan began the Joint Business, they did not have a written agreement of their business relationship. (*Id.*)

In February, 1998, however, Grigorishin and Kiritchenko met in Germany. There they formalized their agreement about the Joint Business in minutes that Grigorishin prepared in Kiritchenko's presence. (*Id.*, ¶10, Ex. A.) The minutes acknowledge that Grigorishin and

---

[5] Bearer share certificates are equity securities that are virtually the equivalent of cash. Although these certificates have no immediate value, the person who holds them owns them; they are negotiable instruments.

Kiritchenko "jointly own[ed] a fund." The two agreed about capital contributions, and the writing confirmed that the gains from the Joint Business would be used first to repay capital and that there would be a 50/50 split. (*Id.*) Kiritchenko and Grigorishin executed a second written agreement later that same month in Moscow. (*Id.*, Ex. B.)

Kiritchenko invested tens of millions of dollars in the Joint Business. (*Id.*, ¶11; *see also* Vartanyan Written Direct Testimony, ¶6 [noting that Kiritchenko invested around $42 million directly into the Joint Business and contributed an additional $100 million through indirect funding of the Joint Business]; *see also* Vartanyan Decl., ¶13, Ex. 6 [spreadsheet demonstrating Grigorishin's and Kiritchenko's investments in Joint Business in 1998].) He re-invested profits he made in his barter business with Grigorishin, and he also invested money he made in his other business. (*Id.*) At some point, Kiritchenko's investment was structured by his putting his business profits in Eurofed Bank, of which he was a part owner, and Eurofed Bank then funded the Joint Business investments with a line of credit. (*Id.*)

Initially, Grigorishin gave Kiritchenko fairly detailed reports on the Joint Business, and early in the relationship Kiritchenko frequently traveled to Ukraine. (*Id.*, ¶12.) However, in late 1998, Kiritchenko encountered legal problems and stopped traveling to Ukraine as he had done previously[6]. At that same time, Grigorishin stopped reporting to Kiritchenko, even though, according to the spreadsheets from this time period prepared by Vartanyan, Grigorishin had received 100% of the bearer share certificates for a series of newly incorporated holding

---

[6] In 1999, Kiritchenko was indicted along with Pavlo Lazarenko, a former Ukrainian Prime Minister, for extortion and money laundering. Kiritchenko entered into a plea agreement with the U.S. government in May 2000. (Ex.11)

companies for the Joint Business around that same time, which, pursuant to their agreement, was to be split 50/50.[7]

In late 2000 or early 2001, Kiritchenko spoke with Grigorishin by telephone and informed him that, while he wanted to stay an owner in the Joint Business and share profits, he wanted his capital investment in the Joint Business to be repaid. (*Id*.) Grigorishin said that he agreed to return Kiritchenko's capital but that the Joint Business did not have enough money to pay him all at once; he would have to be paid over time. (*Id*.) Grigorishin informed Kiritchenko that his business partner – Kuida – would work out the details for him. (*Id*.) In March of 2001, a document was signed acknowledging that Grigorishin had a liability of $94 million for repayment of capital. (*Id*.) The writing also said that Grigorishin would set aside fifty percent of the proceeds "[u]pon the sale of privatized assets." (*Id*., Ex. C.)

In 2002, after Kiritchenko spoke with Grigorishin again on the telephone about getting his capital repaid, he followed up with Kuida at Grigorishin's direction to work out the details. Another writing was then signed setting forth a schedule for Grigorishin to pay Kiritchenko $42,500,000 from 2002 to 2007. (*Id*., Ex. D.)

In 2003, Grigorishin sold a 20% stake in each of five Ukrainian energy companies to Igor Kolomoisky, a Ukrainian businessman. (Vartanyan Decl., ¶29.) In another deal, Grigorishin sold two different plants to Kolomoisky for approximately $60 million. (*Id*.)

---

[7] In his declaration, Vartanyan outlined numerous times in which he incorporated a new series of British Virgin Island holding companies and created bearer share certificates in those companies for 50-50 ownership between Kiritchenko and Grigorishin. But rather than give Kiritchenko his share certificates, he gave all the certificates to Grigorishin "with the understanding" that Grigorishin would give Kiritchenko his 50% share. (Vartanyan Decl., ¶¶15, 16, 17, Ex. 8.)

Corrected Final Award - 1100075691

Kiritchenko was aware that by 2003 Grigorishin had also "unlawfully" removed Vartanyan as director of the joint business companies without Kiritchenko's consent. Kiritchenko and Vartanyan discussed this alleged unlawful removal in 2003.

Grigorishin only paid Kiritchenko some of the money he was owed pursuant to their agreements, but he never made the scheduled payments that they had agreed to nor did he pay him any share of any profits from the Joint Business. (Kiritchenko Written Testimony, ¶13.) Kiritchenko repeatedly tried to contact Grigorishin, but by 2005, Grigorishin had stopped responding to Kiritchenko's communications. (*Id.*) Kiritchenko could not travel to Ukraine to meet directly with Grigorishin because he was afraid he would not be allowed to reenter the United States due to his legal situation and because he was afraid he might be arrested once he got there. (*Id.*) Kiritchenko did not know what the status of the Joint Business was, although he knew there had been tremendous business and political upheaval in Ukraine. (*Id.*) He also knew that Vartanyan had left the Joint Business three years earlier in 2002, although Vartanyan had not communicated with Kiritchenko regarding the status or value of the Joint Business since 1998. (Vartanyan Written Direct Testimony, ¶9.) He did not know who was involved in managing the Joint Business after Vartanyan left. (Kiritchenko Written Direct Testimony, ¶13.)

In 2005, Kiritchenko was approached by attorneys for Igor Kolomoisky. According to the attorneys, Kolomoisky had business disputes with Grigorishin and was interested in making an agreement with Kiritchenko in which Kolomoisky would provide counsel and pay Kiritchenko's expenses for making a claim against Grigorishin.  Kiritchenko and Kolomoisky would then split any recovery from their claims. (*Id.*, ¶14.) Kiritchenko and his attorneys followed up with Kolomoisky's attorneys about this possible arrangement. Kiritchenko believed this could be an opportunity to enforce Grigorishin's agreement to repay him the capital he had invested. (*Id.*)

Vartanyan was also involved and present during some of these discussions.[8]  According to Stan
Roman, Kiritchenko's attorney since 1998, who was involved in the negotiations with
Kolomoisky, Kiritchenko was still considering entering into a funding agreement with
Kolomoisky to pursue claims against Grigorishin as late as June 7, 2006, Ex. 28.  However, the
deal fell through because Kiritchenko could not get cash support from Kolomoisky.  On June 21,
2006, Kolomoisky rejected Kiritchenko's demand for cash in return for Kiritchenko's pursuit of
claims against Grigorishin.  Ex. 10

Meanwhile in 2006, Grigorishin called Kiritchenko and told him that the Joint Business
was in great distress and had lost most of its value but that he was willing to return some money
to Kiritchenko. (*Id*., ¶15.) Grigorishin told Kiritchenko to discuss the terms with his business
agent Kuida, who would make the arrangements for him. (*Id*.) Kiritchenko and Kuida spoke on
the telephone more than five times. Kuida told Kiritchenko that the business had experienced
huge difficulties, that it was having problems with the government, and that it was being sued.
(*Id*.) Kuida also told Kiritchenko that Grigorishin had been arrested and that the Joint Business
did not have enough money or assets to pay Kiritchenko the $42.5 million that they had agreed
to, and that the maximum the Joint Business could pay was $14.5 million. Kuida told
Kiritchenko that if he did not accept that amount, he would never receive anything from his
investment. (*Id*.)

Kiritchenko believed what he was told by Grigorishin and Kuida as it was consistent with
what he understood from media accounts. (*Id*., ¶16.) Although Kiritchenko had not been to

---

[8]Ultimately, Vartanyan testified on behalf of Kolomoisky and against Grigorishin in an arbitration before the LCIA
in London, which resulted in a ruling in favor of Grigorishin.

Ukraine for many years, he had seen reports that huge fortunes were being stolen by competitors or seized by the government, and he had read some reports about Grigorishin's business problems. (*Id.*) Because he had no information that was inconsistent with what Grigorishin and Kuida had told him and because he had no other knowledge of the value of the Joint Business at that time, Kiritchenko concluded that there was no reason to make a claim against Grigorishin since the Joint Business purportedly had no money to give. (*Id.*) Kiritchenko therefore informed Kolomoisky's attorneys that he was not interested in making any arrangement for a claim against Grigorishin, and he then entered into the June 28, 2006 Agreement with Grigorishin and his company Dastime. (*Id.*) In exchange for his receipt of the $14.5 million, Kiritchenko agreed to release all claims known and unknown, and specifically, Kiritchenko released claims concerning "any transfer or alleged transfer or rights or assets out of any of the Transferred Companies." Ex. 3. Kiritchenko made no efforts whatsoever to investigate the assertion of Grigorishin and Kuida with regard to the value of the Joint Business or to ascertain the value of the assets of the Joint Business.

When Kiritchenko received the $14.5 million that was agreed to in the Agreement, he accounted for it as a loss on his federal and California tax returns. (Kiritchenko Written Direct Testimony, ¶17.) When he was later audited by the State of California, Kiritchenko sought assistance from Vartanyan in obtaining documents that could substantiate his initial investment. (*Id.*) Kiritchenko contacted Vartanyan about this issue in December, 2010. (Vartanyan Written Direct Testimony, ¶11.) When Kiritchenko explained to Vartanyan the reason for his inquiry and that he had sold his interest in the Joint Business for $14.5 million, Vartanyan expressed amazement and told Kiritchenko that he was "very stupid" to have relinquished his interests for such an amount.  Kiritchenko Tr. 206, Vartanyan Tr. 308.  Vartanyan told Kiritchenko that the

value of the Joint Business in 2006 was hundreds of millions of dollars. (*Id.*, ¶12.) According to Kiritchenko, this was the first time that he received information indicating that what Grigorishin and Kuida had told him about the value of the Joint Business in 2006 was false. (Kiritchenko Written Direct Testimony, ¶17.) Kiritchenko was very surprised and upset at this news and began to investigate potential claims eventually resulting in the assignment of claims to Moonvale of which Dmitry Buryal is a principal.

For purposes of the proceeding on the Motion for Summary Adjudication only the Arbitrator has assumed that Kiritchenko had not communicated with Vartanyan between 1998 and 2003, and Kiritchenko did not know that Grigorishin had removed Vartanyan from the business in 2002 until the two met in San Francisco in 2003. (*Id.*, ¶20.) At that time, Vartanyan was trying to show Kiritchenko that Grigorishin had illegally removed him as a director of the Joint Business. (*Id*; *see also* Vartanyan Written Direct Testimony, ¶9.) Vartanyan asked Kiritchenko at that meeting if Kiritchenko had agreed to his removal, to which Kiritchenko replied that he did not know anything about it. (*Id.*) Vartanyan then asked Kiritchenko to sign a document confirming that he had been promised 3% of the profits of the Joint Business as compensation for his work. Kiritchenko signed that document. (*Id.*)  For purposes of determination of the Cross-claims and Counter-claims which have been submitted to the Arbitrator on paper, the Arbitrator has no reliable evidence upon which to change her assumptions regarding communications between Vartanyan and Kiritchenko 1998 and 2003 or Kiritchenko's knowledge that Vartanyan had been removed.

Kiritchenko also met with Vartanyan in 2005 in San Francisco. (*Id.*, ¶21; *see also* Vartanyan Written Direct Testimony, ¶10.) The two met briefly with Vartanyan's lawyer at a café. Kiritchenko was told that Vartanyan was helping Kolomoisky in litigation involving

Grigorishin. Vartanyan said that Kolomoisky was interested in making an arrangement with Kiritchenko about a claim against Grigorishin. (*Id.*) There is also evidence of the exchange of at least 20 e-mails between Vartanyan and Kolomoisky in this 2005-2006 time frame. (*Id.*, ¶24; *see also* Resp. Initial Submission, Ex. 4.)  In 2005 and through June 2006, Stan Roman, counsel to Kiritchenko, was in discussions with representatives of Kolomoisky regarding the viability of Kiritchenko's claims against Grigorishin.  Roman's notes reflect conversations about Grigorishin's transfer of assets from the Joint Business with Kiritchenko.  According to notes, Vartanyan was involved in the discussions as well and participated in at least one meeting in April 2006.  Ex. 24. However, the substance of that involvement is unclear. There is no credible, reliable evidence upon which to have a finding in this proceeding regarding Cross-claims and Counter-claims that Kiritchenko learned about the true value of the Joint Business from Vartanyan at that time.

In 2010 after Kiritchenko called Vartanyan regarding his California tax audit, Kiritchenko began looking for someone to fund litigation against Grigorishin and Dastime.

In April 2013, Kiritchenko entered into an agreement to sell documents constituting the 2006 Agreement for $10 million dollars to Moonvale, a British Virgin Island company, controlled by Dmitry Buriak.  Subsequently in August 2013 with an agreement to split any proceeds received from this arbitration, Kiritchenko assigned his rights under the 2006 Settlement Agreement to Moonvale which on October 21, 2013 filed its Statement of Claims that initiated these arbitration proceedings.  After Kiritchenko assigned his claims against Grigorishin to Moonvale in 2013, Vartanyan was given a 5% interest in any recovery from the claims because he was supposed to get 3% of profit from the Joint Business and because he would be asked to spend time helping pursue the claims. (*Id.*, ¶23.) Notably, in his Written Direct

Testimony, Vartanyan states that he was to receive a 3% share of any recovered funds, (*see* Vartanyan Written Direct Testimony, ¶15), and, at the hearing, Vartanyan testified that he is supposed to get a 10% interest in Moonvale's recovery, if any.

## LEGAL ANALYSIS

It is undisputed that, pursuant to the parties' 2006 Agreement, the law of the State of California governs the rights and obligations arising out of that Agreement. 2006 Agreement §10. Ex. 3. Thus, California law will be applied herein and the applicable statute of limitations is either three or four years for Claimant's fraud and rescission of a written contract claims, respectively. *See* Cal.Civ.Proc. §§338(d), 337(3).

### *Statute of Limitations Defense and the Delayed Discovery Rule*

The statute of limitations, which is a "collective term . . . commonly applied to a great number of acts, or parts of acts, that prescribe the periods beyond which a plaintiff may not bring a cause of action," operates as an affirmative defense to a claim. *Norgart v. Upjohn Co.* (1999) 21 Cal. 4th 383, 395-96. The statute of limitations has as a purpose to protect defendants from the stale claims of dilatory plaintiffs. It also has as a related purpose to stimulate plaintiffs to assert fresh claims against defendants in a diligent fashion. (*Id*. at 395.) "Inasmuch as it necessarily fixes a definite period of time, [the statute of limitations] operates conclusively across the board, and not flexibly on a case-by-case basis." (*Id*.) Most often, the affirmative defense based on the statute of limitations has been approved by courts as favored because, "in accord with public policy, it promotes repose by giving security and stability to human affairs." (*Id*. at 396.)

Under the statute of limitations, a plaintiff must bring a cause of action within the limitations period applicable thereto after accrual of the cause of action. (*Id*. at 397.) The general

rule for defining the accrual of a cause of action sets the date as the time when, under the substantive law, the wrongful act is done, or the wrongful result occurs, and the consequent liability arises. (*Id*). In other words, it sets the date as the time when the cause of action is complete with all of its elements. (*Id*.)

An exception to the general rule for defining the accrual of a cause of action is the delayed discovery rule. (*Id*.) This rule postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. (*Id*.) The plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks actual knowledge thereof. In other words, the plaintiff discovers the cause of action when he either has actual knowledge of the wrongdoing or when the plaintiff "suspects . . . that someone has done something wrong" to him, *i.e.*, when he has notice or information of circumstances to put a reasonable person on inquiry. *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110-11; *see also Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal. 4th 797, 803 ("under the delayed discovery rule, a cause of action accrues and the statute of limitations begins to run when the plaintiff has reason to suspect an injury and some wrongful cause, unless the plaintiff pleads and proves that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action. In that case, the statute of limitations for that cause of action will be tolled until such time as a reasonable investigation would have revealed its factual basis.")

While Respondents would typically have the burden of proving the statute of limitations defense, because Claimant is arguing that Respondents' fraud and misrepresentations were not discovered until sometime outside the limitation period, it is Claimant's burden to plead and prove these facts – a burden conceded by Claimant to belong to Claimant.

While the statute of limitations ordinarily is an affirmative defense and the burden rests on the defendant to prove such defense, yet in an action for fraud which is commenced more than three years after it occurred the burden is not on the defendant to show that knowledge of the facts was brought home to the plaintiff but is on the plaintiff to prove that he did not discover the facts constituting the fraud within three years prior to the commencement of the action; and he must further show the time and the circumstances under which they were brought to his knowledge. A plaintiff in such a case as this would be defeated if no evidence were given on either side, and if he should fail to meet the burden of proof cast upon him the defendant would not be required to prove facts and circumstances discrediting the plaintiff's allegation or showing its unlikelihood or improbability. Until the burden is met by the plaintiff the defendant may remain silent. *Cansino v. Bank of Am.* (2014) 224 Cal. App. 4th 1462, 1472.

Having determined the governing legal principles, the undersigned will proceed to examine whether Kiritchenko (Claimant's purported assignor) had actual knowledge of Grigorishin's fraud, concealment and misrepresentation prior to October 21, 2009 or October 21, 2010, or if Kiritchenko at least knew of material facts that would have made a reasonably prudent person suspicious of Respondents' wrongdoing and would have put him on inquiry notice prior to that time frame.[9]

<u>Actual Notice</u>

Respondents contend that Kiritchenko had actual notice of the supposed claims, which is evidenced by the fact that Kiritchenko "was admittedly communicating with Vartanyan throughout the negotiations for the 2006 Agreement." (*See* Resp. Initial Submission, p.15). Respondents' position is unpersuasive in light of the fact that the undersigned has accepted all facts as asserted by Claimant as true for purposes of the statute of limitations inquiry and further has found no evidentiary bias as stated above to change that finding for purposes of the determination of the Cross-claims and Counter-claims of Respondent.[10] Both Kiritchenko and

---

[9] The fact of assignment or claims of assignment put Assignor's knowledge at issue.

[10] The undersigned should note that she also finds Respondents' argument irrelevant and unpersuasive to the extent that it improperly asks her to make credibility determinations. (*See, e.g.*, Resp. Initial Submissions, pp.15-16 ["consider the credibility of this assertion from Kiritchenko's perspective;" "consider the credibility of the story from Vartanyan's perspective;" "[c]oming from anyone else, this story would be absurd; coming from a convicted

Vartanyan stated in their Written Testimony that they did not discuss the true value of the Joint

Business with each other until 2010. (*See* Kiritchenko Written Testimony, ¶¶18, 20, 21, 24;

Vartanyan Written Testimony, ¶¶9, 10, 12.)  The discrete issue to be decided regarding the

Motion for Summary Disposition was not whether Respondents lied to Kiritchenko or whether

they concealed any facts. Indeed, for purposes of motion the undersigned assumed that this is, in

fact, what Respondents did. Rather, the issue for the statute of limitations decision was whether

Kiritchenko knew or reasonably could have discovered the alleged true facts earlier than

Moonvale's asserted December 2010 discovery date. That analysis could be done without

considering the credibility of any of the declarants or witnesses to the extent they address the

statute of limitations issue.  No matter how strongly Respondents argued that the very fact of

these communications is enough to infer that Kiritchenko had notice of Grigorishin's alleged

wrongdoing, in light of Kiritchenko's and Vartanyan's Written Testimony, the undersigned did

not make such an inference in the summary disposition proceeding. *Aguilar v. Richfield Co.*

*(2001),* 25 Cal.4th 826.) and further does not accept it for purposes of the findings of fact

regarding the Counter-claims and Cross-claims.

<u>Inquiry Notice</u>

The undersigned does agree with Respondents' position, however, that as a matter of law,

Kiritchenko was on inquiry notice of Respondents' alleged wrongdoing as of the 2006

Agreement. As already set forth, *supra*, the law on inquiry notice states as follows:

> A plaintiff need not be aware of the specific "facts" necessary to
> establish the claim; that is a process contemplated by pretrial
> discovery. Once the plaintiff has a suspicion of wrongdoing, and
> therefore an incentive to sue, she must decide whether to file suit
> or sit on her rights. So long as a suspicion exists, it is clear that the

---

felon with a history of admitted perjuries it smacks of fraud on the arbitration process;" "Vartanyan must overcome
other credibility issues"].)

> plaintiff must go find the facts; she cannot wait for the facts to find her.

*Jolly*, *supra*, 44 Cal. 3d at 1111.

Despite Claimant's protestations to the contrary, an objectively reasonable person would have had suspicions at the time of the 2006 Agreement that Grigorishin and Kuida were lying to him.  Kiritchenko had, as of the time of the 2006 Agreement, received no reports on the Joint Business from Grigorishin for at least eight years. (*See* Kiritchenko Written Direct Testimony, ¶12.) Kiritchenko had also actively tried to "protect himself" during this time period by asking Grigorishin for his capital back and then entering into several debt repayment agreements dated 2001 and 2002, which Grigorishin in turn repeatedly breached for five years. (*See id.*, ¶¶12, 13, Exs. C, D.) Kiritchenko was also aware of the news reports of Grigorishin's legal and political battles for control of the supposed joint assets from 2002 to 2006. (*See id.*, ¶16.)  In exploring the feasibility of claims against Grigorishin during discussions involving Kolomoisky's possible backing of a law suit, Kiritchenko's attorney, Stan Roman, as early as late November, 2005 had reason to believe from information from Vartanyan's representative, Katya Stelmakl, that there had been unauthorized transfers of Kiritchenko's assets by Grigorishin. Ex. 4; Ex. 9. Kiritchenko had every reason to suspect the value of the companies exceeded what Grigorishin was offering.  In fact, in discussions with Kolomoisky in 2005 and 2006 he valued his claim at between $10 to $50 million dollars plus 50% of any recovery.

Kiritchenko nonetheless decided to sell his interest in the companies for $14.5 million, and he agreed to broad and sweeping releases in the Agreement that released all known and unknown claims, including claims involving "any transfer or alleged transfer" of assets from the companies.  According to Kiritchenko, he did this in blind reliance on information provided to him by Grigorishin and Kuida, without conducting any due diligence of the business on his own

and without asking for any representations and/or warranties from Respondents about the business, its assets, or its valuations. (*See* Kiritchenko Written Direct Testimony, ¶¶ 15, 16.)

Kiritchenko asserts that despite all this knowledge, because "…the structure of the Joint Business was so complex only Grigorishin and his agent knew of the true value of the assets and such information was not available to Kiritchenko. Kiritchenko asserts he could not have discovered through reasonable investigation the injury of the misrepresentation of the value of his interest in the Joint Businesses and that Grigorishin through his agent Kuida misrepresented the status of the Joint Businesses and the value of Kiritchenko's shares." (Claimant Submission on SOL issue, p.10.) This assertion is belied by the fact that, at the same time that Kiritchenko and Kuida were discussing the state of the Joint Business and the related terms of the 2006 Agreement, Kiritchenko was also discussing all kinds of legal and business issues with Grigorishin's former Managing Director, Vartanyan. (*See id.*, ¶¶17, 20, 21, 24, Resp. Initial Submission, Ex 4; Vartanyan Written Direct Testimony, ¶¶ 11, 9, 10.) Kiritchenko has failed to adequately explain why he could not have asked these important questions of Vartanyan before 2010. Moreover, in the interim Vartanyan had also already testified against Grigorishin in arbitration proceedings initiated by Kolomoisky or otherwise engaged in other investigations of the status of Grigorishin and the Joint Business.[11] Nothing about Vartanyan's knowledge or circumstances had changed during the intervening four years. No reasonably prudent person could ignore these red flags and then consummate such a significant transaction with assistance of counsel, which Kiritchenko had, without being considered on inquiry notice, an inquiry that

---

[11] Kiritchenko's assertion that he could not have inquired into the value of the Joint Business prior to signing the 2006 Agreement because "[h]e was involved in a legal proceeding in [the] United States which occupied his time" is wholly unpersuasive. (*See* Cl. Submission on SOL issue, p.14.) The fact that Kiritchenko's legal proceedings may have been a distraction to Kiritchenko does not excuse his failure to inquire about the true state of the Joint Business' affairs.

Kiritchenko did not make.  The delayed discovery rule, therefore, does not apply in this situation. *See Jolly*, *supra*, 44 Cal.3d at 1110-11 [plaintiff discovers the cause of action when he either has actual knowledge of the wrongdoing or when the plaintiff suspects that someone has done something wrong to him, *i.e.*, when he has notice or information of circumstances to put a reasonable person on inquiry.]  Claimant's causes of action are barred by the applicable statute of limitations. Kiritchenko was on inquiry notice of Grigorishin's purported misrepresentation and fraud in 2006 when he signed the Agreement.  He did nothing to inquire or investigate underlying alleged facts for at least four years.  Seven and one-half years passed between the alleged misrepresentation and the time the Demand for Arbitration and Statement of Claims was filed.

<u>Fiduciary Duty</u>

Claimant contends that Kiritchenko and Grigorishin were in a fiduciary relationship; thus, Kiritchenko had no duty to inquire and conduct reasonable discovery. Even assuming, without deciding, that under California law such a fiduciary relationship actually existed, Kiritchenko still had a duty to investigate once he became aware of facts that would have made a reasonably prudent person suspicious. *See Bedolla v. Logan & Frazer* (1975) 52 Cal.App. 3d 118, 131. Even a fiduciary cannot "be willfully ignorant when it has knowledge of facts that would lead it to inquire about a potential claim." *Applera Corp.-Applied Biosystems Grp. v. Illumina, Inc.*, No. C 07-02845 WHA, 2008 WL 170597, at *6 (N.D. Cal. Jan. 17, 2008) [citing *Bedolla*, *supra*, 52 Cal.App.3d at 130-31].

As was discussed in significant detail, *supra*, Kiritchenko failed to make any inquiry into the state of affairs of the Joint Business prior to or after signing the 2006 Agreement, despite the fact that (1) he lacked important information about the Joint Business for at least eight years, (*see*

Kiritchenko Written Direct Testimony, ¶12), (2) Grigorishin had already entered into agreements with him that Grigorishin then subsequently breached (*id.*, ¶13), (3) he was aware of the political and legal difficulties that Grigorishin was having in Ukraine, and (4) Grigorishin was now claiming that Kiritchenko's $100 million investment was only worth $14.5 million, (*id.*, ¶15). This, as a matter of law, was reason enough to make Kiritchenko suspicious.

Claimant's reliance on any purported fiduciary relationship is therefore unpersuasive.

<u>Estoppel</u>

Claimant's estoppel argument is equally without merit. As Claimant notes, the elements of equitable estoppel are (1) the party to be estopped must know the facts; (2) the party must intend that his or her conduct will be acted on, or must act in such a way that the party asserting the estoppel had the right to believe that the conduct was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and (4) that party must rely upon the conduct to his or her detriment. (*Ashou v. Liberty Mutual Fire Ins. Co.* (2006) 138 Cal.App.4th 748, 766-67.) "[W]hether an estoppel exists – whether the acts, representations or conduct lulled a party into a sense of security preventing him from instituting proceedings before the running of the statute, and whether the party relied thereon to his prejudice – is a question of fact and not of law." (*Holdgrafer v. Unocal Corp.* (2008) 160 Cal.App.4th 907, 925-26.)

Here, as discussed, *supra*, based on the facts in the light most favorable to Kiritchenko, it would be unreasonable to conclude that Grigorishin's "acts, representations or conduct lulled [Kiritchenko] into a sense of security preventing him from instituting proceedings before the running of the statute." (*See Holdgrafer*, *supra*, 160 Cal.App.4th at 925-26.) Kiritchenko chose not to investigate Grigorishin's and Kuida's representations.  Kiritchenko chose to enter into the 2006 Agreement and release all of his legal claims and to make no further inquiry. The Claimant

has provided no basis whatsoever that could conceivably support a finding of reasonable reliance on the misrepresentations that could justify Kiritchenko's refraining from pursuit of his claims against Dastime and Grigorishin within the period of the statute of limitations.  Claimant's estoppel argument, therefore, cannot prevail.  Kiritchenko did nothing in the intervening four (4) years between the signing of the Agreement and his conversation with Vartanyan in 2010 to investigate any of the representations of Grigorishin or Kuida.

### Breach of Contract

The elements of a breach of contract are: (1) a contract, (2) plaintiff's performance of the contract or excuse for nonperformance, (3) defendant's breach, and (4) resulting damage to plaintiff. *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014).  The 2006 Agreement constitutes the contract between Dastime and Kiritchenko and was the basis for Claimant's claims in this Arbitration.  Respondent, Dastime performed all obligations under this contract, specifically the payment of $14.5 million to Kiritchenko. Among other provisions, the 2006 Agreement between Dastime and Kiritchenko provided a mutual release of any known and unknown claims and an identical release for Respondent, Grigorishin.

Section 9 of the 2006 Agreement expressly released any and known and unknown claims in any way related to the alleged Joint Business, including without limitation, claims concerning any alleged unauthorized transfers from the Joint Business companies:

> Each of the Parties, on behalf of himself, his heirs and assigns, and related entities and individuals hereby waives and releases the other Party, his agents, attorneys, heirs and assigns, and related entities and individuals, from any and all claims of any kind or description that he (or they) may have against such Party, its agents, attorneys, heirs and assigns, and related entities and individuals, relating in any way to any of the Businesses or any interest in any of the Businesses, whether know or unknown and whether choate or inchoate, including, without limitation, any claim of the Seller, his heirs or assigns or any entity related to the Seller relating to (i) his investment in the Businesses as referred to in the preamble to this Contract or otherwise, or (ii) any loan or purported Loan or other

investment or advance made by the Seller to the Buyer, or one or more entities or individuals related to the Buyer, relating to his or its purchase of an interest in any of the Businesses, or (iii) any transfer or alleged transfer of rights or assets out of any of the Transferred Companies, save for those rights and obligations provided for in this Contract. Each of the Parties intends to release claims of which they may presently be unaware (except for claims under this Contract) and expressly waives any rights under California Civil Code Section 1542, which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if know by him or her must have materially affected his or her settlement with the debtor."

Later, Kiritchenko entered into an attempted transfer to Moonvale of interests in and claims to the Joint Business (*See* Assignment of Claims and Claims Proceeds Agreement between Moonvale Investments Limited and Peter Kiritchenko, entered into on August 6, 2013 produced in the JAMS Arbitration as MOON02674-94.). However, Kiritchenko had already sold any such interests to Respondents for $14.5 million and released any claims in the 2006 Agreement. Claimant also gave Kiritchenko a financial interest in any recovery from this Arbitration. Kiritchenko breached his contractual obligation with Dastime when he attempted to assign his claims to Moonvale knowing Moonvale would proceed to assert claims he had released.

Kiritchenko also breached the 2006 Agreement by selling Joint Business documents to Moonvale for $10 million. (*See* April 16, 2013 agreement between Moonvale Investments Limited and Peter Kiritchenko, produced in the JAMS arbitration between Moonvale Investments Limited and Dastime Group Ltd., JAMS Reference No. 11000075691, as MOON02417-23.) Dastime was entitled to "all book and records in his possession or control, including corporate and financial books and records relating to any of the Business." 2006

Agreement § 3. Kiritchenko clearly retained documents that should have been "delivered" to Dastime under the terms of the Agreement and sold them to Claimant.

Further, Kiritchenko agreed in § 11 of the 2006 Agreement to keep the Contract strictly confidential:

> Each of the Parties agrees to keep the existence of this Contract, and its terms and contents, strictly confidential, except as may be required by applicable law. If one Party believes that any disclosure otherwise prohibited by this Section 11 must, pursuant to applicable law, be made it shall immediately inform the other Party and co-operate, to the extent permitted by applicable law, with such other Party to limit or prevent such disclosure.

Kiritchenko breached that provision when he sold the 2006 Contract and as well as various documents relating to the alleged Joint Business to Moonvale, some of which were attached to the Statement of Claims filed in this Arbitration.

### Intentional Interference with Contract

To prove intentional interference with contract, Respondents must show: (1) a contract between Respondents and Kiritchenko, (2) that Moonvale knew of the contract, (3) that Moonvale's intentional acts were designed to induce a breach or disruption, (4) that Moonvale actually breached or disrupted the contractual relationship, and (5) that Moonvale's conduct was a substantial factor in causing Respondents' harm. *Pac. Gas & Elec. Co. v. Dear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).

The 2006 Agreement was a valid contract between Respondents and Kiritchenko. Moonvale knew of the contract and releases and sought to buy claims arising out of it. Moonvale intentionally tried to induce a breach of the general release and the other provisions discussed above. Moonvale's offer to Kiritchenko of $10 million in cash and a financial stake in the outcome of this Arbitration was a substantial cause in Respondents having to incur legal fees

and costs in the defense of this Arbitration.  Moonvale did intentionally interfere with the 2006

contractual agreements between the Respondents and Kiritchenko.

Damages that flow from Kiritchenko's breach and Moonvale's tortious conduct are the

same as discussed below.

### *Affirmative Defenses*

Claimant, Moonvale, and Kiritchenko contend that Respondents' legal and equitable

causes of action are barred by the defenses of unclean hands, mistake, and economic duress.

Claimants have failed to meet their burden of proof and their burden of persuasion on these

issues. *See Gularte v. Martins* (1944) 65 Cal.App.2d 817, 820. These affirmative defenses,

therefore, fail.

### Unclean Hands

Under the doctrine of unclean hands, inequitable conduct of a party seeking relief in

connection with the transaction before the court or which affects the equitable relations between

the litigants in the matter before the court provides a defense to a legal and equitable action. *See*

*Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 446; *Kendall-Jackson Winery,*

*Ltd. v. Sup. Ct.* (1999) 76 Cal.App.4th 970, 985.

Here, Claimant and Kiritchenko contend that Respondents are guilty of unclean hands

because in her First Interim Award, the undersigned found that, based on the state of the record,

that Respondents made misrepresentations, and concealed facts about the true value of the Joint

Business and convinced Kiritchenko to accept $14.5 million and sign a release.

Whether Respondents misrepresented or lied to Kiritchenko when he entered into the

2006 Agreement is however immaterial.  Kiritchenko had no reasonable basis to believe the

misrepresentations as discussed above and, further, his own testimony at the December hearing

clearly established he did not have any trust in the Respondents or their representatives at the time he entered into the 2006 Agreement.

Most importantly, the unclean hands defense raised in this instance is connected to the Respondents' claims for damages arising out of Kiritchenko's agreements with Dastime that led to this Arbitration – agreements Kiritchenko reached with Dastime only because Kololmoisky would not pay him as much for his "assignment" of claims as Dastime did.  A party asserting an unclean hands defense must prove that the criticized conduct "directly affect[s] or infect[s]" the claim. *Brown v. Grimes*, 192 Cal App. 4th 265 (2011). Respondents have failed to demonstrate the wrongful conduct, i.e., Respondents' 2006 misrepresentations, and Kiritchenko's wrongful actions in entering into agreements with Dastime in 2013, which led to this Arbitration and Respondents Cross-claims and Counter-claims are directly connected.

The Respondents are not entitled to relief under the unclean hands defense.

<u>Mistake of Fact</u>

Claimant and Kiritchenko contend that, because Kiritchenko was mistaken as to a material fact – the value of his interest in the joint business – and this mistake was known to Respondents, Respondents' contract causes of action must fail. The undersigned does not agree.

Pursuant to California Civil Code section 1577, "mistake of fact" is "a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in: 1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or, 2. Belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed." Cal.Civ.Proc. §1577.

As the undersigned noted, *supra*, Kiritchenko was at least on inquiry notice of the facts of which he now claims he was mistaken.  For example, at the time of the 2006 Agreement,

Kiritchenko had received no reports on the Joint Business from Grigorishin for at least eight years, Kiritchenko had entered into several debt repayment agreements in an effort to protect himself, but none of those debts were ever fully repaid, Kiritchenko was aware of the news reports pertaining to Grigorishin's legal and political battles, and Kiritchenko's attorney had had very telling conversations with Vartanyan's representative indicating that there had been unauthorized transfers of Kiritchenko's assets. In light of his knowledge, Kiritchenko's reliance on Respondents' valuation of the joint business was, as a matter of law, both "preposterous" and "irrational." *See Goldner v. Jaffe* (1959) 171 Cal. App. 2d 751. Kiritchenko's conduct, therefore, was negligent. *See id*; Cal.Civ.Proc. §1577. Kiritchenko neglected to conduct any due diligence regarding the value of the Joint Business and he never asked for any representations and/or warranties about the business, its assets or its valuations. The defense of mistake of fact is therefore of no avail to Moonvale or Kiritchenko.

Economic Duress

Relying on *CrossTalk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 644 and *Uniwill v. City of Los Angeles* (2004) 124 Cal.App.4th 537, Kiritchenko contends that he can "avoid the [2006] contract" because he was subjected to a coercive act when Kuida proposed the contract for $14.5 million, and Kiritchenko had no reasonable alternative but to accept Kuida's proposal. The undersigned does not agree. Kiritchenko failed to meet his burden with any credible evidence whatsoever that he had no reasonable alternative "but to succumb to" Respondents' proposition. He provided no credible financial statements or clarification of his financial status and his testimony lacked any specificity with regard to his financial condition or that of various corporations in which he held interests.

### *Disgorgement*

Relying on the Restatement (Third) of Restitution and Unjust Enrichment § 39, Respondents request that the Arbitrator require Kiritchenko to disgorge to them the purported $10 million unjust profit that he received from (1) selling documents and assigning interests and claims to Moonvale that he had already agreed to provide/release to Respondents in return for their $14.5 million and then (2) fraudulently and aggressively pursuing sham litigation through the withholding of known, dispositive documents in pursuit of his promised contingency fee. According to Respondents, neither Kiritchenko nor any claimant should be allowed to keep such ill-gotten gains to finance their attorneys' fees, this sham litigation, their withholding of documents and their on-going perjury. Respondents also contend that disgorgement is necessary to ensure that Kiritchenko has no incentive to try to breach his 2006 Contract obligations again, whether by purporting to sell released interests or by disclosing confidential information to try to create trouble for Respondents.

Under California law, disgorgement is only available as a remedy in breach of contract cases where the breaching party violated a fiduciary or quasi-fiduciary duty owed to the victim of the breach, *see Am. Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal. App. 4th 1451, 1483; *County of San Bernadino v. Walsh* (2007) 158 Cal.App.4th 533, 542-43[12], in connection with the breach of a nondisclosure agreement governing trade secrets or proprietary information, *see, e.g., Ajaxo, Inc. v. E\*Trade Group, Inc.* (2005) 135 Cal.App.4th 56, 57, or under certain statutes, *see, e.g., Ahdout v. Hekmatajah* (2013) 213 Cal.App.4th 21, 38-40 [discussing disgorgement remedy found in Contractors' State License Law]. This case does not involve any

---

[12] Interestingly, Respondents cite to this case in their Reply brief, but it is not a simple contract case. It involves the breach of a fiduciary duty. It is therefore not applicable here.

of these legal or factual scenarios, however.  Respondents' request for disgorgement therefore is DENIED.

Respondents' reliance on various cases as well as on section 39 of the Restatement (Third) of Restitution and Unjust Enrichment does not alter this decision.  For example, no California court has cited section 39 with approval or formally adopted it as the law in the state since its enactment in 2011,[13] and according to the Reporter's Note to the Restatement, section 39 "has no counterpart in either the first or second restatement of contracts."

With regard to Respondents' reliance on *Kansas v. Nebraska* (2015) 135 S.Ct. 1042, 1056 and *Madrid v. Perot Sys. Corp.* (2005) 130 Cal.App.4th 440, these cases are distinguishable from the instant matter. For example, *Kansas* involved a breach of a compact for water rights between two states and applied federal law to the situation. It did not involve a commercial dispute between two private parties under the laws of California. *See, supra*, 135 S.Ct. at 1051-52. And *Madrid* is distinguishable in that it only discussed the remedies that are available for violations of California's unfair competition law. *Madrid, supra*, 130 Cal.App.4th at 460-61. *Madrid* did not discuss the available remedies for breach of contract.

Finally, the undersigned should note that, in their Reply brief, Respondents appear to move away from their disgorgement request and move towards a claim for unjust enrichment. This claim was never raised in Respondents' counter-claim, however. Respondents make merely generalized conclusory arguments in support of this late claim and provide no evidence to substantiate the claim. The Arbitrator rejects this claim as being without foundation in law or equity in any event.

---

[13] Notably, Respondents only cite out of state cases to support their position – *see* Resp. 4/11/16 Br., pp. 27-28, citing *Enslin v. The Coca-Cola Co.*, No. 2:14-CV-06476 (E.D. Pa. Sept. 30, 2015) 2015 WL 5729241, at *15, *Watson v. Cal-Three, LLC* (Colo. App. 2011) 254 P.3d 1189, 1195, *Boston Sci. Corp. v. Mirowski Family Ventures, LLCD*, No. 1:11-CV-00736-WTL (S.D. Ind. Aug. 17, 2012) 2012 WL 3579884, at *6.

For all of the above stated reasons, Respondents claim for disgorgement is denied.

### Attorneys' Fees and Costs

As a direct result of Kiritchenko's breach of contract as discussed above and Moonvale's tortious conduct, Respondents were forced to incur costs and attorney's fees in defense of claims made by Moonvale. Those reasonable attorney's fees and costs constitute damages to which Respondents are entitled from each. Moonvale and Kiritchenko are, thus jointly and severally, liable for the Respondents' damages.

Further, Respondents argue that, pursuant to the JAMS International Rules, they are entitled to recover the attorneys' fees and costs that they incurred defending against Moonvale's claims as damages for Kiritchenko's alleged breach of contract. Moonvale disagrees, arguing that the American Rule, not the JAMS International Rules, applies, and under the American Rule Respondents would only be entitled to attorneys' fees if a statute or clause in their contract provided for attorneys' fees, which the 2006 Contract does not. Kiritchenko also objects to Respondents' request for attorneys' fees, explaining that Respondents' request should be denied because of unclean hands, because there was no enforceable contract due to mistake and because Kiritchenko did not breach any provision of the 2006 contract. For the reasons stated in detail, *infra*, the Arbitrator is persuaded by Respondents' position.

As noted, *supra*, at the onset of this arbitration, both JAMS and the undersigned determined that JAMS International Rules apply to this case based on JAMS International Rules 1.2 and 1.4 and the fact that Moonvale pleaded that the parties were in different states at the time of the 2006 contract and that a substantial amount of the transactions or occurrences giving rise to the dispute took place in different states. Pursuant to JAMS International Rule 1.2, "[w]hen the Rules govern the arbitration, the parties will be deemed to have made the Rules a part of their

arbitration agreement." JAMS International Rules, Rule 1.2. Thus, because the JAMS

International Rules were deemed to govern this arbitration, those rules, as a whole, are deemed to

be part of the 2006 Contract's arbitration provision. *See also Advanced Micro Devices, Inc. v.*

*Intel Corp.* (1994) 9 Cal.4th 362, 400 ["An arbitrator's remedial powers, and limitations on those

powers, can arise from a number of different sources. The substantive law underlying the claim

being arbitrated, the contract allegedly breached . . . the arbitration agreement, *and the rules*

*adopted by the parties to govern the arbitration* are all potential sources that may either expand

or limit the scope of the remedies available to an arbitrator."] [emphasis added].

Two such rules are of particular importance here. Those rules include JAMS International

Rule 34.4 and JAMS International Rule 34.1. JAMS International Rule 34.4 specifically

provides:

> 34.4 The Tribunal will fix the arbitration costs in its award. The
> Tribunal may apportion such costs among the parties if it
> determines that such apportionment is reasonable, taking into
> account the circumstances of the case.

JAMS International Rules, Rule 34.4. And JAMS International Rule 34.1 states:

> 34.1 Arbitration costs consist of:
>
> (a) The Tribunal's fees;
>
> (b) The Filing Fee and JAMS International's administrative fees as
> set forth in the Schedule of Fees and Costs;
>
> (c) The fees and expenses of any expert appointed by the Tribunal;
>
> (d) The reasonable costs for legal representation of a successful
> party; and
>
> (e) Any costs incurred in connection with an application for
> interim or emergency relief.

JAMS International Rules, Rule 34.1. Pursuant to these rules, the Arbitrator is instructed to "fix

the arbitration costs," and those costs include the Tribunal's fees, the filing fee, the JAMS

International administrative fees, and most importantly here, the reasonable costs for legal representation of a successful party. Respondents, therefore, are entitled to each of these costs under these provisions.

Moonvale and Kiritchenko contend that this conclusion is in error, citing the American Rule, noted, *supra*, and the fact that Paragraph 10 of the 2006 Contract states that it shall be governed by the laws of the State of California. With regard to the former, as the undersigned has already noted, the JAMS International Rules, not the American Rule, apply herein. And with regard to the latter, even if the laws of the State of California did apply to this case, under those laws, Respondents would still prevail since, as the Arbitrator has already noted, attorneys' fees are authorized under the 2006 Contract via JAMS International Rules 34.1 and 34.4, and California Code of Civil Procedure section 1033.5(a)(10) provides that attorneys' fees are specifically recoverable as costs "so long as they are authorized by the parties' contract or statute." Cal.Civ.Proc. §1033.5(a)(10). Moreover, California Code of Civil Procedure section 1297.318 gives the Arbitrator discretion to award attorneys' fees. That section specifically states: "[u]nless otherwise agreed by the parties, the costs of an arbitration shall be at the discretion of the arbitral tribunal," and those costs can include "[l]egal fees and expenses." Cal.Civ.Proc. §1297.318. Thus, even under California law, Respondents are entitled to recover their reasonable attorneys' fees.

Having decided that Respondents are entitled to recover their reasonable attorneys' fees, the Arbitrator must next decide if Respondents can recover those fees from Moonvale, from Kiritchenko, or from both under the JAMS Rules. Moonvale contends that, because the language in JAMS International Arbitration Rule 34.4 is permissive, stating only that the Arbitrator "will fix the arbitration costs in its award," the undersigned should use her discretion and not award

Respondents their requested attorneys' fees. Moonvale's argument is based on the doctrine of unclean hands and the fact that this was not a "sham" case. Moonvale's arguments, however, are unpersuasive.

With regard to its unclean hands defense, Moonvale merely states, without citing any facts or law to support its position, that "the doctrine of unclean hands should preclude Respondents from being awarded any affirmative relief, including an award of attorneys' fees or costs." *See* Moonvale 5/27/16 Opp. Br., p.13. This conclusory statement is insufficient for Moonvale to meet its burden. Moreover, the doctrine of unclean hands only applies if the party asserting the defense shows that the criticized conduct "directly affect[s] or infect[s]" the claim as discussed above. *Brown v. Grimes* (2011) 192 Cal. App. 4th 265, 283. Because there is no direct connection between Respondents' misrepresentations to Kiritchenko in 2006 and Kiritchenko's decision to transfer claims to Dastime over seven years later, the doctrine of unclean hands does not bar Respondents' request for attorneys' fees incurred in defending themselves in this Arbitration. With regard to Moonvale's position that this is not a "sham" case, even if true, the undersigned finds it an insufficient rationale to deny Respondents reasonable attorneys' fees and costs.

JAMS International Rules expressly give the undersigned discretion to "apportion such costs among the parties if it determines that such apportionment is reasonable, taking into account the circumstances of the case." JAMS International Rules, Rule 34.4. As a matter of equity and based on her discretion considering the circumstances of this case, the undersigned therefore finds Kiritchenko jointly and severally liable for Respondents' costs and fees. Kiritchenko received a $10 million upfront payment from Moonvale and a stake in any potential recovery in this action. To claim that Kiritchenko, because of his attempted assignment, had no

interest in the prosecution of this Arbitration and had no control over its direction is therefore disingenuous at best. Indeed, it was Kiritchenko's initial breach in 2013 of the 2006 Agreement that started this Arbitration in the first place; his upfront and contingency recoveries fueled the progress of the Arbitration.

<u>Calculation of Reasonable Attorneys' Fees and Costs</u>

The starting point for the inquiry for determining the reasonableness of attorneys' fees and costs is "the number of hours reasonably expended multiplied by the reasonable hourly rate" to arrive at the lodestar amount. *PLCM Group, Inc. v. Drexler, Inc.* (2000) 22 Cal. 4th 1084, 1095. Reproduced below is a table prepared by Respondents showing the total lodestar amount for the two firms Farella Braun & Martel LLP ("Farella") and Egorov Puginsky Afanasiev & Partners ("EPAP") representing Respondents in this matter, together with costs incurred:

|  | Revised Initial Statement Nov 2013-April 2016 | Supplemental Statement May – July 2016 | TOTAL |
|---|---|---|---|
| **Farella Braun + Martel** | **$3,547,050.62**<br><br>($3,303,150.00 in attorneys' fees and $243,900.62 in costs) | **$139,169.63**<br><br>($135,142.00 in attorneys' fees and $4,027.63 in costs) | **$3,686,220.25**<br><br>($3,438,292.00 in attorneys' fees and $247,928.25 in costs) |
| **Egorov Puginsky Afanasiev & Partners** | **$2,444,452.15**<br><br>($2,217,221.41 in attorneys' fees and $227,230.74 in costs) | **$87,677.48**<br><br>($85,261.76 in attorneys' fees and $2,415.72 in costs) | **$2,532,129.63**<br><br>($2,302,483.17 in attorneys' fees and $229,646.46 in costs) |
| **Respondents Dastime Group Limited and Konstantin Grigorishin** | **$279,000.00**<br><br>($279,000.00 in costs) | N/A | **$279,000.00**<br><br>($279,000.00 in costs) |
| **TOTAL** | **$6,270,502.77** | **$226,847.11** | **$6,497,349.88** |

Respondents' Supplemental Statement of Attorneys' Fees and Costs, 8/26/2016.

Where, as here, the opposing party has raised an objection to the requested fees, the Arbitrator must consider the following relevant factors to determine whether the lodestar figure should be adjusted or reduced: "the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case." *Id.* at 1096; Ketchum *v. Moses* (2001) 24 Cal.4th 1122, 1132 (same).[14]  "The purpose of such adjustment [in accordance with the foregoing criteria] is to fix a fee at the fair market value for the particular action." *Ketchum*, 24 Cal. 4th at 1132.  An award of attorneys' fees may include the fees incurred in connection with the underlying claim, as well as those incurred in establishing entitlement to fees. *Id.* at 1141.

The fee applicant has the initial burden of showing the reasonableness of the requested fees, supported by adequate evidence. *Center for Biological Diversity v. County of San Bernardino* (2010) 188 Cal. App. 4th 603, 615; *Christian Research Institute v. Alnor* (2008) 165 Cal. App. 4th 1315, 1320 ("The evidence should allow the court to consider whether the case was overstaffed, how much time the attorneys spent on particular claims, and whether the hours were reasonably expended.").  Once that burden is met, the opposing party bears the burden of showing that the lodestar figure is not reasonable, *i.e.*, that specific hours for which recovery is sought are excessive, duplicative, unnecessary, or otherwise noncompensable. *Drexler, supra,* 22 Cal. 4th at 1095.  In making the independent assessment as to what is reasonable compensation under the relevant criteria, the factfinder "must carefully review attorney

---

[14]     Respondents suggest that, in making this determination, the Arbitrator should also consider their contention that the case posed "serious personal and political implications for Grigorishin both in Ukraine and Russia" and was brought in part for the ulterior purpose of obtaining documents "to use collaterally against him and to damage [him] in a politically corrupt Ukraine." Respondents' Reply ISO Attorneys Fees and Costs, 12/14/16, p. 32.   The Arbitrator declines to view this as relevant to the determination of a reasonable fee, as an assessment of the political risks allegedly facing Grigorishin would entail a political judgment that is beyond the scope of this arbitration.

documentation of hours expended: … inefficient or duplicative efforts is not subject to compensation." *Ketchum*, 24 Cal.4th at 1132.

The ultimate determination of what constitutes reasonable attorney fees is committed to the discretion of the fact-finder. *Drexler*, 22 Cal. 4th at 1096.  As California law recognizes, the factfinder's legal experience makes him or her "an expert in the matter of attorney's fees." *Excelsior Union High School Dist. of Los Angeles Cty. v. Lautrup* (1969) 269 Cal. App. 2d 434, 448.  The Arbitrator "may make [her] own determination of the value of the services contrary to, or without the necessity for, expert testimony." *Drexler*, 22 Cal. 4th at 1096 [interior quotation marks omitted.] *Syers Props. III, Inc. v. Rankin* (2014) 226 Cal. App. 4th 691, 699.  *See also Drexler*, 22 Cal. 4th at 1095 ("the experienced trial judge is the best judge of the value of professional services rendered in his court….").

In support of their fee application, Respondents submitted declarations from counsel estimating the number of hours spent by each attorney assigned to the case and describing the various tasks performed, broken down into three phases.  Respondent did not submit the attorneys' daily time records.  At the Arbitrator's suggestion, Respondents submitted final supplemental declarations that fleshed out the descriptions of tasks and estimated time spent by each attorney in three month periods; the declarations do not provide the precise date(s) on which the various services were rendered or what other attorneys and staff participated in the same time frame on the same issue.[15]

---

[15] Declarations that were submitted and considered were:

**Andrew Mac**
8/25/2016 – Supplemental Declaration ISO Resp's Attys Fees & Costs
5/31/2016 – Declaration of Resp's ISO Statements of Attys Fees & Costs
12/9/2016 – Reply Declaration ISO Resp's Statement of Fees & Costs and in Opposition to John Pierce's Report on Farella Hourly Rates

**Anton Berezin**

As part of its opposition, Claimant and Cross-Respondent submitted an independent expert analysis prepared by John S. Pierce.  The Arbitrator has considered Mr. Pierce's analysis, as well as his deposition testimony taken November 21, 2016 to the extent he has elucidated certain issues.   Claimant/Cross-Respondent's overarching complaint is that the lack of contemporaneous time records has "significantly impeded" the ability to evaluate the reasonableness and necessity of the fees requested by Respondents. Independent Expert Analysis of Legal Fees and Costs, 10/25/16, p. 9.  As discussed in more detail in the discussion of block-billing below, although it is generally preferable to have the time records available when assessing a fee request, such records are not required.  California law is clear that counsels' declarations may provide sufficient support to meet a fee claimant's initial burden for an award of fees and costs. *Lunada Biomedical v. Nunez* (2014) 230 Cal. App. 4th 459, 487. However, if such declarations prevent the fact finder from thoroughly evaluating the reasonableness of the time spent, the fact finder has the discretion to reduce the lodestar amount on a percentage basis. *Christian Research Institute, supra,* 165 Cal. App. 4th at 1325; *Heritage, supra*, 215 Cal. App. 4th at 1010-11.

---

8/26/2016 – Declaration ISO Resp's Attys Fees & Costs
12/14/2016 – Declaration ISO Resp's Reply Attorney Fees & Costs

**Neil Goteiner**
8/26/2016 – Declaration ISO Resp's Attys Fees & Costs

**Kelly Matayoshi**
8/26/2016 – Declaration ISO Resp's Attys Fees & Costs

**Brandon Wisoff**
8/25/2016 – Supplemental Declaration ISO Resp's Attys Fees & Costs
5/31/2016 – Declaration ISO Resp's Statements of Attys Fees & Costs

*Rates*

For purposes of the lodestar, Respondents' counsel base their claims on the following

rates:

Farella Legal Staff

| **Name** | **Position** | **Rate**[16] |
|---|---|---|
| Aguilar, Dina | Paralegal | 235.00 |
| Duncan, Paul | Paralegal | 305.00 to 315.00 |
| Esponda, Fernando | Paralegal | 300.00 |
| Geiger, Ben | Associate | 595.00 |
| Goteiner, Neil | Partner | 1100.00 to 1500.00 |
| Johnson, Claire | Associate | 325.00 |
| Keane, William | Partner | 795.00 |
| Lee, Christoffer | Associate | 430.00 to 490.00 |
| Marangio, Dianne | Paralegal | 285.00 to 305.00 |
| Matayoshi, Kelly | Associate | 350.00 to 450.00 |
| Thamkul, Janel | Senior Associate | 445.00 to 565.00 |
| Van Dyke, Charity | Paralegal | 290.00 |
| Wisoff, Brandon | Partner | 775.00 to 855.00 |

EPAP Legal Staff

| **Name** | **Position** | **Rate**[17] |
|---|---|---|
| Berezin, Anton | Senior Associate | 315.09 to 388.50 |
| Gorokhova, Anna | Paralegal | 88.80 |
| Kazantsev, Mikhail | Partner | 1044.30 |
| Kovnatskaya, Yana | Paralegal | 108.78 to 109.42 |
| Mac, Andrew | Partner | 654.60 to 826.44 |
| Mironova, Svetlana | Associate | 142.69 to 222.00 |
| Molokhoeva, Tuyana | Junior Associate | 179.27 to 190.30 |
| Mozharova, Lidia | Junior Associate | 152.44 to 169.06 |
| Radnaev, Victor | Senior Associate | 382.57 to 460.32 |
| Raschevsky, Evgeny | Partner | 659.43 to 828.57 |
| Valkov, Oleg | Associate | 229.70 |

---

[16] Rates varied due to reasonable increases over the three year span of this arbitration.
[17] EPAP records and bills its time in euros and each timekeeper's hourly rate in US dollars fluctuated depending on the conversion rate at the time of billing. The hourly rates listed here and below were calculated by dividing the total fees in dollars for each timekeeper by the number of hours billed during the relevant phase.

As noted, *supra*, to determine the reasonableness of a litigant's requested attorneys' fees and costs, the Arbitrator must assess "the number of hours reasonably expended multiplied by the *reasonable hourly rate*" to arrive at the lodestar amount. *Drexler*, *supra*, 22 Cal. 4th at 1095 (emphasis added).  Here, Claimant and Cross-Respondent contend that the rates of the Farella and EPAP attorneys are not reasonable. The undersigned recognizes that the rates claimed are high, however, does not agree that they are unreasonable.

This is a highly complex international case (indeed, this case was made more complex by the manner in which Moonvale and Kiritchenko litigated it) that requires the attorneys to have an extensive knowledge and understanding of the laws of multiple countries. It has involved an extraordinarily high level of risk for all of the parties involved given the amounts claimed in the hundreds of millions of dollars, and it has required an atypically high level of expertise in business litigation.

Mr. Goteiner, who has been practicing law for over 40 years and has extensive trial experience in complex business matters, was uniquely qualified to pursue this case on behalf of Respondents as lead counsel of the Farella team. Indeed, Mr. Mac explains in detail why, after law firm comparison shopping, including interviewing four other firms for the assignment with comparable rates, he ultimately chose Mr. Goteiner and the Farella law firm to represent Respondents in this case. *See* Mac Decl, ¶¶ 8-11. Mr. Goteiner was hired for his unique hands-on approach as a trial lawyer and strategist, and notably also for his knowledge of Russian business ethics and sensibilities surrounding the pre- and post- privatization period of the 1990s. In addition to his 20th century Soviet Union studies at Yale, Goteiner hosted 60 Soviet businessmen (along with his business transaction partner and Stanford business school experts) during the

privatization and Soviet break-up period. *Id.* at ¶¶ 9-10. His rates, at least in this highly unusual instance, are therefore commensurate with the experience and expertise he brought to this case. Likewise, the rates of the Farella attorneys and paralegals are within the reasonably acceptable range for an international matter of this complexity.

Similarly, Claimant and Cross Respondent have not adequately explained why EPAP's rates are unreasonable. The rates that the EPAP attorneys charged are well within the range of market rates charged by other attorneys involved in complex international arbitration in San Francisco.

The undersigned does not agree with Claimant and Cross-Respondent's position and finds that the rates sought by all of Respondents' attorneys in this complex, high-stakes litigation are reasonable.[18]

The Arbitrator must now consider the time and staffing spent on the matter in the analysis of the lodestar.

*Internal Litigation Budget*

The undersigned agrees with Claimant/Cross-Respondent that such activity should not be reimbursed. Tasks such as conducting conflict checks, opening new files, and preparation of budgets are tasks geared more to protecting the interests of the firm rather than furthering the client's interests. The Arbitrator agrees with Pierce that Farella appears to claim $3,940.50 and 4.6 hours for such activities. That amount should and will be deducted from Farella's claim. However, Pierce appears to have overestimated the time spent on budgeting as it relates to EPAP. Pierce attributed 63.21 hours and corresponding fees of $44,549.50 billed by EPAP to

---

[18] To be clear, the Arbitrator would likely not have reached this same conclusion if this had been a more mainstream, run-of-the mill matter. But for the reasons discussed in more detail, *supra*, this is simply not the case.

budgeting. A review of the declarations show that Pierce deducted entire entries when budgeting was only one item among a number of substantive issues addressed in the same entry. The Arbitrator finds that 11 hours and corresponding fees of $7,744.00 should be deducted from EPAP's petition.

### Research Regarding Enforcement of Arbitration Award

Respondents seek to recover approximately sixteen hours of time spent performing legal research on the issue of the enforceability of a potential arbitration award in Russia or Ukraine. The undersigned concludes that such fees are reasonable and Respondents are entitled to recover them.  *See Ketchum*, 24 Cal. 4th at 1141, fn. 6 (attorneys' fees devoted to enforcement of judgment are generally recoverable).

### Travel Time

On seven occasions, Farella counsel flew from San Francisco to New York, London, Washington, D.C., or Kiev to meet with their clients and prospective witnesses, and billed approximately 136 hours for time spent in-flight.  Although some of that flight time was spent performing legal services, as discussed further in the section on block-billing, it is not entirely clear how much of the time billed was for purely flight time.  In any event, this was a complex case with much at stake, made more complicated by the need to review a large number of documents, many of which were translated from Russian or Ukranian and involved highly sensitive issues.  Under these circumstances, Respondents were not unreasonable in preferring in-person meetings, as opposed to the less costly alternative of video conferencing. Accordingly, the time spent on travel for client and witness meetings is reasonable and may properly be compensated. Time spent on travel by EPAP also appears reasonable.

*Administrative and Clerical Tasks*

The undersigned agrees with Claimant and Cross-Respondent that many of the tasks performed by librarians and other professional support staff are administrative or clerical, and as such are properly considered to be non-compensable overhead. Included in this category is document management work and "bundling." Excepted from this category is work performed by paralegals, which requires certain legal acumen and training and is commonly deemed compensable as a separate line item. In reviewing the declarations, the Arbitrator has deducted the lodestar relating to librarian and internal professional staff in the amount of $16,207 from the Farella claim and $19,575 from the EPAP claim.

*Review of London Arbitration*

Respondents seek compensation for approximately 142 hours spent reviewing the testimony given in a prior arbitration in London and analyzing the potential effect of that arbitration on this proceeding. Claimant and Cross-Respondent contend that the London arbitration presented only a "minor issue" in this proceeding, and therefore the hours spent by Respondents are excessive. Peter Kiritchnko's Opposition to Respondents' Statement of Attorneys Fees and Costs, 10/25/16, p. 10. The undersigned disagrees with this characterization. The London arbitration involved many of the same players and transactions involved in the proceeding here, and the testimony given by Alexander Vartanyan in the London arbitration concerning the value of the Joint Business' assets and the transfers of such assets was crucial to Respondents' statute of limitations defense. From 1995 to 2002, Mr. Vartanyan had acted as Managing Director for the Joint Business and was a key witness for Claimant. It was essential for Respondents to analyze Mr. Vartanyan's London testimony to develop a comprehensive understanding of his role in many of the events equally at issue in this arbitration. Doing so

enabled Respondents to assess the credibility of that testimony and its impact on the critical issues in this arbitration.  Accordingly, the undersigned agrees with Respondents that the hours associated with this effort were reasonably spent.

### Protective-Confidentiality Order

Claimants object to the approximately 125 hours billed by Respondents' attorneys for briefing and argument on the scope of the protective order issued in this arbitration, again characterizing it as a minor issue.  The undersigned disagrees.  CMO No. 1 and Protective Order. Although the number of hours appears high, it is not unreasonable. Maintaining the confidentiality of this proceeding was and continues to be an important consideration, particularly in light of the media interest in this highly contentious dispute. All parties have expressed the desire that the order stay in place. Protective Order ¶ 8(c).

### "Vartanyan Theft Allegations"

Claimant/Cross-Respondent object to the approximately 430 hours spent investigating what Claimants refer to as the "Vartanyan theft allegations."  Vartanyan was alleged to have improperly transferred assets from the Joint Business in 2003 worth wildly varying amounts in value.  As mentioned above, Vartanyan was a key witness for Claimants in this arbitration, and these allegations had bearing on both his credibility as well as the value of the Joint Business for purposes of calculating Claimants' potential damages.  Although the number of hours devoted by Respondents to investigating these allegations seems high in the abstract, as a practical matter the task of tracing the alleged transfers was unavoidably time-consuming as many involved multiple layers of transfers from one offshore vehicle to another and an intricate web of international transactions. Extensive in-depth review by the Respondents of the transfers was necessary and reasonable. Respondents' counsel spent a reasonable amount of time on this issue.

*Motion to Compel Stan Roman to Testify*

Claimant and Cross-Respondent object to the approximately 180 hours spent by Respondents on a motion to compel Stan Roman, one of Kiritchenko's attorneys, to testify about information he had obtained regarding the status of the Joint Business and alleged unauthorized transfers by Grigorishin of assets belonging to Kiritchenko, shortly before Kiritchenko signed the 2006 Settlement Agreement. The parties first attempted to agree on a set of stipulated facts; when that attempt failed, the motion was filed and was vigorously contested by Cross-Respondent. Finding Mr. Roman's testimony pertinent to this proceeding, the undersigned granted the motion. Mr. Roman's testimony about notes of meetings with third parties was an important factor in the Arbitrator's findings of fact as set forth in this Award. Respondents' time on the motion was reasonable.

*Motion to Bifurcate Liability from Damages*

Claimant and Cross-Respondent contend that the time spent on Respondents' motion to bifurcate liability and damages should not be compensated. The Arbitrator denied the motion, finding that the liability and damages issues were intertwined. The fact that an otherwise prevailing party does not succeed on a particular issue does not by itself justify denying fees for the time devoted to the issue. The pursuit of the motion to bifurcate liability from damages was a legitimate and reasonable legal tactic in furtherance of the client's interests and is compensable. Further, the time spent on the motion is reasonable.

*Intrafirm and Farella-EPAP Conferences and Correspondence*

Claimants and Cross-Respondent have called into questions the high number of hours billed by multiple timekeepers (nearly 2,500 hours) for internal conferences as well as Farella-EPAP meetings and telephone calls and characterize EPAP as having acted simply as "de facto"

in-house counsel for Dastime or Grigorishin.  According to Claimants, as purported in-house counsel, EPAP merely monitored Farella's work and acted as a liaison between Farella and the clients, and in that role, much of EPAP's work was entirely duplicative of Farella's.  According to Claimants, they should not be required to compensate Respondents for EPAP's participation in this limited and redundant capacity.

The undersigned rejects the notion that EPAP's role was limited to acting as in-house counsel for Dastime/Grisgorishin, as nothing in the record substantiates this contention.  As Respondents note, Grigorishin and Dastime in fact had an actual salaried in-house counsel who participated in the case, for whose time Respondents do not seek compensation.  Respondents' Reply ISO Attorneys' Fees and Costs, p. 40.  Further, even if EPAP had been acting solely as in-house counsel, legal services performed in that capacity are recoverable by a prevailing party.  *See, e.g., Drexler*, 22 Cal. 4th at 1091-92.

More importantly, this litigation involved complex international transactions arising out of investments, through holding companies, in dozens of Ukrainian concerns that had been privatized.  The amount in controversy was enormous.  Unraveling the tangled skein of transactions engaged in by the Joint Business over the span of a decade required near-Herculean effort and considerable skill, and was further complicated by the fact that much of the documentation concerning the investments was in Russian or Ukrainian or other foreign languages.  In this regard, EPAP's specialized knowledge and familiarity with Ukrainian energy markets, the Ukrainian privatization process, Russian and Ukrainian business practices, and the Russian language provided critical support in the preparation of Respondents' defense.  By necessity then, frequent collaboration among Farella and EPAP timekeepers was required to keep the entire litigation effort on track.

Because the arbitration hearing addressed only the statute of limitations defense, the relative brevity of the hearing belies the exceptionally complex nature of the underlying issues in this litigation.  As noted below, Respondents' attorneys were obliged to prepare a defense to the case on the merits in the event that the limitations defense did not succeed, and could not await the resolution of that issue before undertaking the complicated and time-consuming work needed to defend the action in its entirety, an action, it must be emphasized, initiated by Moonvale in collaboration with Kiritchenko.

Although the fees in this category are admittedly high, the undersigned concludes that the time spent is neither excessive nor unreasonable under the circumstances of this difficult and challenging litigation.

*Request for Tax Subpoena*

Claimants argue that Respondents' legal fees associated with work on a request for a tax subpoena to Claimants' tax consultant should be reduced by 50%.  Respondents spent approximately 67 hours, which included legal research into tax privilege issues after Moonvale opposed the subpoena.  The subpoena was never issued, largely because subsequent events rendered it less significant.  While necessary at the time, the undersigned agrees that the time spent on this issue was excessive, and concludes that the suggested 50% reduction to the Farella claim in this issue is appropriate. Therefore, $21,255 for 33.65 spent on this issue is deducted from Farella's claim.

*Preparation of Chronology*

The chronology of this complicated matter was important to the issues in this case, however, the time for preparation of chronologies by EPAP appears excessive. A reasonable fee for the amount of time claimed which appears attributable to this issue is $388 per hour for 40

hours for a total of $15,520. A review of EPAP records shows $52,950 attributable to this task, a somewhat lower number than Pierce estimated. Therefore, a deduction of $37,430 ($52,950 - $15,520 = $37,430) from the EPAP claim is appropriate.

*International or Comprehensive JAMS Rules*

Farella claims $98,528 and EPAP $46,439 for fees relating to dispute regarding the application of JAMS International Rules. Upon review of the declarations, the Arbitrator finds $15,760 as a reasonable lodestar amount to EPAP in calculating fees on this issue and $42,725 to Farella. Thus, the deductions of claims for fees relating to this matter are $30,679 for EPAP ($46,439 - $15,760 = $30,679) and $55,803 for Farella ($98,528 - $42,725 = $55,803).

*Remaining Categories*

Disputed categories relating to redundancy in staffing such as unnecessary multiple attendance of attorneys and paralegals at meetings is discussed below. The remainder of the specific categories of tasks to which Claimant and Cross-Respondent object  as set forth in the Pierce report reflect Respondents' preparation for a full-blown arbitration hearing on the merits in the event that the statute of limitations defense did not prevail.  It would have been professionally irresponsible for Respondents to postpone these tasks pending the outcome of the initial hearing.  Indeed, at his deposition, Mr. Pierce agreed that Respondents needed to prepare a defense to the entire case on the merits and could not simply assume that they would win on statute of limitations grounds.  Pierce deposition, p. 256:6-12. ("...you would have prepared for both liability and damages up until the statute of limitations motion was granted.") The undersigned finds these additional categories reasonable and fully compensable.

*The Block-Billing Issue*

As the undersigned has noted, California law is clear that declarations from counsel such as filed in this matter may be sufficient to support an award of attorneys' fees, even without the time records on which the declarations are based. *Raining Data Corp. v. Barrenchea* (2009) 175 Cal. App. 4th 1363, 1375 ("an award of attorney fees may be based on counsel's declarations, without the production of detailed time records."). Claimants, however, argue that the declarations introduced by Respondents here are indistinguishable from "block-billing" and that they impermissibly prevent a full and meaningful assessment of the reasonableness and necessity of the fees requested. California courts have defined "block-billing" as "when 'a block of time [is assigned] to multiple tasks rather than itemizing the time spent on each task.'" *Mountjoy v. Bank of America, N.A.* (2016) 245 Cal. App. 4th 266, 279 (*quoting Heritage Pacific Fin., LLC v. Monroy* (2013) 215 Cal. App. 4th 972, 1010).

While Respondents are correct that a fee applicant is not required to satisfy "auditing perfection," it is equally true that adequate documentation must support the requested fees. *Cf. Drexler, supra. See, e.g., Syers Props. III, Inc. v. Rankin* (2014) 226 Cal.App.4th 691, 700 ("The type of categorical breakout of time expended by each attorney and paralegal [is] 'an especially helpful compromise between reporting hours in the aggregate (which is easy to review, but lacks informative detail) and generating a complete line-by-line billing report (which offers great detail, but tends to obscure the forest for the trees).'"). Declarations are not a substitute for the arbitrator's independent exercise of judgment and discretion in making a determination of reasonableness. *See Heritage Pac. Fin., LLC, supra*, 215 Cal.App.4th at 1010-11. The Arbitrator must make a careful review for inefficiencies. *Ketchum at 1132.* If documentation, however, prevents the fact finder from thoroughly evaluating the reasonableness of the time spent, the fact

finder has the discretion to reduce the lodestar amount on a percentage basis where the documentation does not permit a thorough examination regarding redundancy and overstaffing. *Christian Research Institute, supra,* 165 Cal. App. 4th at 1325; *Heritage, supra*, 215 Cal. App. 4th at 1010-11.

In this case, counsels' declarations do not, strictly speaking, meet the definition of "block-billing." Instead, they estimate the "retrospective allocation of time entries by task from historical daily time records…." Respondents' Reply ISO Attorneys' Fees and Costs, 12/14/16, pp. 16, 18. As EPAP appears to concede, however, EPAP's daily time records from which the declarations are derived "are in fact block billed" in that they "do not allocate time by task." Indeed, Andrew Mac admits as much in his Supplemental Declaration in Support of Respondents' Attorneys' Fees and Costs where he explains that he and two other EPAP timekeepers "most times listed all tasks conducted in a day in a single entry with a total amount of time for all such tasks collectively." Mac Suppl. Decl, ¶3, Ex. A.

While Farella's declarations arguably provide more information than "block-billed" time by providing time allotted to certain tasks or issues, they still contribute to a lack of transparency similar to that created by block-billing. The declarations only establish the amount of time spent on the particular tasks described, but they do not demonstrate that the time spent was not duplicative or the result of overstaffing.

It remains difficult if not impossible to ascertain from the declarations the extent to which Respondents' attorneys' efforts may have been duplicative, inefficient or the product of overstaffing. Claimants note the attendance of multiple attorneys from Farella and EPAP at various meetings and phone conferences in this matter but it is not possible to tell which time keepers were at what events.

Corrected Final Award - 1100075691

Given the difficulty in discerning the extent to which many of the hours billed in the lodestar amount reflect redundancies or overstaffing, the undersigned has concluded that, for the Farella firm, the amount remaining after deleting the specific categories already disallowed should be further reduced by five percent (5%). Lack of transparency was not the only consideration in reducing the fees for EPAP. EPAP played a secondary role to Farella in these arbitration proceedings. The Arbitrator has taken into account that in her judgment some of the services billed by EPAP appear to be duplicative of those of Farella and not necessary to the defense of this action. For EPAP, the amount remaining after deleting the specific categories already disallowed should be further reduced by fifteen percent (15%).

*Attorneys' Fees Summary*

Based on the foregoing analysis, the attorney's fees to which Respondents are entitled is as follows:

| | **FARELLA** | **EPAP** |
|---|---|---|
| **Total Claim** | $3,438,292.00 | $2,302,483.00 |
| **Less:** | | |
| **Preparation of Chronologies** | --- | ($37,430.00) |
| **Arbitration Rules Dispute** | ($55,803.00) | ($30,679.00) |
| **Internal Litigation Budgeting** | ($3,940.00) | ($7,744.00) |
| **Administrative and Clerical Tasks** | ($16,207.00) | ($19,575.00) |
| **Tax Subpoena** | ($21,255.00) | --- |
| **Subtotal** | $3,341,087.00 | $2,207,055.00 |
| **Subtotal Less:** | $167,054.35 (5% x $3,341,087.00) | $331,058.25 (15% x $2,207,055.00) |
| **Total:** | $3,174,032.70 | $1,875,996.75 |

*Costs*

Respondents' claim $247,928.25 for costs incurred by the Farella firm and $229,646.46 for costs incurred by EPAP during the course of this arbitration. In addition, Respondents seek $279,000 for fees to Kroll Associates UK Ltd. ("Kroll") a London based forensic accounting consulting firm. Upon review of objections of Claimant and Cross-Respondent to those costs, the Arbitrator finds as follows:

*On-Line Legal Research, Internal Word Processing, and Software*

Respondents seek $86,925.68 for online legal research, $5,930.92 for word processing and $2,948.50 for three software and computer related changes, all which are sought by Farella. All of these items are internal overhead costs, a fact not disputed by Respondents. Respondents' Reply in Support of Attorneys' Fees and Costs at p. 65. The Arbitrator finds no justification for recovery of costs that are general office and overhead expenses. Such costs are presumed to be considered in the determination of the agreed fee for service. Respondents have provided no documentation that such costs were ever expected to be paid in addition to the fee for service reached between Farella and Respondents. These items are not subject to reimbursement.

The undersigned agrees with Claimant and Cross-Respondent that these costs are appropriately considered part of a law firm's overhead, and as such it is not reasonable to shift these costs to Claimant and Cross-Respondent.

*Ukranian Law Counsel and Ukrainian Law Experts*

EPAP is seeking $108,777.33 for Ukrainian Law Counsel and $26,148.18 for "Ukrainian Law Experts". Claimant and Cross- Respondent object to these costs as inadequately undocumented. The Arbitrator disagrees. The costs of the Ukrainian Counsel reflects work done by attorneys with EPAP in the Ukraine and is supported by EPAP counsel declarations regarding

rates and hours. The Ukrainian law expert refers to Professor Dorgert who prepared an eleven page report opining on what law Ukrainian Courts would apply to the 1998 agreement and on fiduciary obligations the parties owed each other under Ukrainian laws. His fee of $22,410 is reasonable.

*Forensic Accountant*

Respondents are seeking $279,000 for the fees paid to their forensic consultant – Kroll, which engaged in tracing millions of dollars through various banks and intermediary companies relating to a myriad of international financial transactions engaged in by the Joint Business for over a decade. These fees are both reasonable and justified in light of the complexity of this case, the opaque nature of the transactions and the amount of documentation of those transactions that were at issue. Without such efforts, Respondents would never have been able to begin to disprove Kiritchenko's claimed investments or demonstrate the proprietary of the transfers among Respondents' businesses. These costs were therefore necessary to Respondents' defense and are recoverable by Respondents here.

*Costs*

The following costs incurred by Respondents in this arbitration are reasonable and recoverable:

|  | **FARELLA** | **EPAP** |
|---|---|---|
| **Travel Expenses** | | |
| June 2014 – April 2016 | $58,197.70 | $87,900.75 |
| May 2016 – July 2016 | --- | $2,415.72 |
| **Court Reporter fees** | $7,446.85 | --- |
| **Translations** | $3,917.29 | --- |
| **Service of Process** | | |
| May 2016 – July 2016 | $60.00 | --- |

Corrected Final Award - 1100075691

**In-house Reproduction Services**
| | | |
|---|---|---|
| June 2014 – April 2016 | $9,253.50 | --- |
| May 2016 – July 2016 | $304.35 | --- |

**Delivery**
| | | |
|---|---|---|
| June 2014 – April 2016 | $1639.34 | $287.50 |
| May 2016 – July 2016 | $176.36 | --- |

**Mediation fees**
| | | |
|---|---|---|
| June 2014 – April 2016 | $62,933.75 | --- |
| May 2016 – July 2016 | $1,270.57 | --- |

| | | |
|---|---|---|
| **Ukranian Law Counsel** | --- | $112,515.50 |
| **Ukranian Law Experts** | --- | $22,410.00 |
| **Translations** | --- | $373.48 |
| **Subtotal** | $145,199.71 | $225,902.95 |

In addition, Respondents are entitled to reimbursement of $279,000 paid to Kroll for the forensic accounting discussed above.

All remaining claims of Respondent for costs including costs for conference call service and video conferences as well as other miscellaneous costs have been considered and are denied.

*Sanctions*

In their June 8, 2016 reply brief, pursuant to JAMS International Rule 30.2, Respondents ask the undersigned to issue sanctions against Claimants for acting in bad faith, abusing the arbitral process and refusing to cooperate with discovery orders. The undersigned disagrees that sanctions are warranted in this situation, however. Respondents have failed to adequately prove that Claimant or Kiritchenko acted in bad faith, abused the arbitral process or refused to cooperate with discovery orders to such an extent that would warrant the issuance of sanctions. Respondents' request for sanctions is therefore DENIED.

## Conclusion

Having been designated in accordance with paragraph 10 of the parties' 2006 Agreement and having examined the submissions, proof and allegations of the parties, and heard and considered the testimony of all witnesses, both live and by declaration, the Arbitrator finds that Claimant's causes of action are barred by the applicable statute of limitations. The Arbitrator concludes that Kiritchenko was at least on inquiry notice of Respondents' wrongdoing at the time he entered into the 2006 Agreement. Thus, by at least that date the statute of limitations on Kiritchenko's claims began to accrue. Claimant, the assignee of Kiritchenko's claims, has not successfully met its burden of proving that the delayed discovery rule applies to this action or that it is entitled to equitable estoppel.  Therefore, Respondents are entitled to a dismissal of Moonvale's claims for intentional misrepresentation, fraudulent inducement, concealment and negligent misrepresentation.

With regard to Respondents' requested relief, the Arbitrator finds that Respondents have successfully proven their breach of contract, against both Kiritchenko and intentional interference with contract as to Moonvale. Moonvale and Kiritchenko have failed to meet their burden of proving any of their affirmative defenses.

Respondents are not, however, entitled to disgorgement of profits or sanctions. They are entitled to their reasonable attorneys' fees and costs, arising out of the defense of this Arbitration and pursuit of Counter-claims and Cross-claims for which both Moonvale and Kiritchenko are jointly and severally liable in the following amounts:

The total attorneys' fees and costs to be awarded Respondent is calculated below:

| | |
|---|---|
| Farella attorneys' fees and costs: | $3,319,232.40 |
| EPAP attorneys' fees and costs: | $2,101,899.70 |

Dastime costs: $279,000.00

**Total:** **$5,700,132.10**

## CORRECTED FINAL AWARD

For all the foregoing reasons claims of, Claimant, Moonvale Investments Ltd. for intentional misrepresentation, fraudulent inducement, concealment and negligent misrepresentation are DISMISSED.

Claims of Respondents, Dastime Group Ltd. and Konstantin Grigorishin for breach of contract against Cross-Respondent Peter Kiritchenko and claims against Moonvale Investments Ltd., for intentional interference with contractual relations are GRANTED.

Respondents' request for disgorgement of profits and sanctions is DENIED.

Respondents' request for their reasonable costs and attorneys' fees is GRANTED and Moonvale Investments Ltd. and Peter Kiritchenko are jointly and severally liable to Dastime Group Ltd. and Konstantin Grigorishin for these fees and costs of $5,700,132.10.

This Award is subject to the following Protective Order:

In lieu of, and superseding, any protective orders entered in this Arbitration, the following terms govern this enforceable arbitration award:  All documents and information produced, provided, filed or exchanged in the Arbitration that have been designated "Confidential" or "Highly Confidential" may be used for the limited purposes of:  1) confirming, vacating, correcting, enforcing or opposing enforcing, and collecting the arbitration award, including collecting attorneys' fees and costs or damages arising from, caused by, or resulting from this arbitration, and 2) supporting or furthering Respondents' or their agents' claims in any subsequent litigation, arbitration, or legal action against any parties arising out of or related to the issues in this arbitration.  These claims include, but are not limited to, the enforcement of any arbitration awards and any Respondents' action against Alexander Vartanyan or against other

individuals or entities related in any way to this Arbitration. In addition, all documents and information marked "Highly Confidential" shall continue to be disclosed only to the attorneys in this Arbitration and to attorneys assisting in enforcing this Award, and their staffs, retained experts, the court or entity presiding over the dispute, the court reporters and interpreters retained, witnesses who are identified on the face of the document as the original authors or recipients, and witnesses who are or are agents of the party that produced the document.

Should a party to this Arbitration wish to use any documents or information designated "Confidential" or "Highly Confidential" as permitted above, the parties shall meet and confer prior to the filing of any such document or information. The party proposing using "Confidential" or "Highly Confidential" documents or information shall submit the draft pleadings and documents that party intends to file to the other party at least three court days in advance of the proposed filing. If the parties are unable to agree on an alternate method, the party filing shall use good faith efforts to file the "Confidential" or "Highly Confidential" material under seal as may be permitted by the court; however, the party filing need not advocate in support of sealing other than reference to this award, and the burden of supporting sealing shall rest entirely on the party that desires the documents and information be sealed. The aforementioned requirement to meet and confer and file under seal shall not apply to the filing of this award itself or any other interim awards, which may be used to confirm, vacate, correct, enforce or oppose enforcement, and collect the arbitration award without the need to file under seal. In the event that materials designated "Confidential" or "Highly Confidential" are made public through the process described above, such materials shall no longer be considered "Confidential" or "Highly Confidential." Nothing herein prevents any court or tribunal in any

subsequent action from granting relief from the provisions of this protective order provision for good cause shown.

This Award is subject to confirmation by a court of competent jurisdiction.


IT IS SO ORDERED.


Dated: _Munh 23_ , 2017

Hon. Rebecca L. Westerfield (Ret.)
Arbitrator
Executed in San Francisco, CA, USA

## CERTIFICATE OF CORRECTED FINAL AWARD

I, the undersigned Arbitrator, hereby certify that, for the purposes of Article I of the Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, the attached Corrected Final Award was made in San Francisco, CA, USA. I have compared the attached Corrected Final Award to the original of such Corrected Final Award, and further certify that the attached is a true copy, and I am the individual who executed the Corrected Final Award.
Dated:

_March 23, 2017_

Hon. Rebecca Westerfield (Ret.)
Arbitrator


State of California

ss.:

County of San Francisco


I, Rebecca Westerfield, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the Certification of the Award.

Sworn to before me this 23 day of _March 2017_

SEE ATTACHED
Notary Public

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of San Francisco

Subscribed and sworn to (or affirmed) before me on this 23rd day of March , 20 17 , by Rebecca Westerfield

_____ ,
proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

GILAYNA JOY SANTOS
Commission # 2123850
Notary Public - California
San Francisco County
My Comm. Expires Aug 16, 2019

(Seal)                    Signature _____

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Moonvale Investments Limited vs. Dastime Group Limited, et al.
JAMS Reference No. 1100075691

I, Patricia M. Usak, not a party to the within action, hereby declare that on March 24, 2017, I served the attached CORRECTED FINAL AWARD on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San Francisco, CALIFORNIA, addressed as follows:

Neil A. Goteiner Esq.
C. Brandon Wisoff Esq.
Kelly M. Matayoshi Esq.
Farella Braun & Martel LLP
235 Montgomery Street
17th Floor
San Francisco, CA  94104
Tel: 415-954-4485
Email: ngoteiner@fbm.com
bwisoff@fbm.com
kmatayoshi@fbm.com
 Parties Represented:
 Dastime Group Limited
 Konstantin Grigorishin

Andrew Mac Esq.
EPAP USA PLLC
1700 H Street, NW
#62
Washington, DC  20006
Tel: 202-507-5762
Email: andrew_mac@epamusa.com
 Parties Represented:
 Dastime Group Limited
 Konstantin Grigorishin

Stan Roman Esq.
Tracy Clements Esq.
Keller Sloan Roman & Holland LLP
555 Montgomery Street
17th Floor
San Francisco, CA  94111
Tel: 415-249-8334
Email: sroman@ksrh.com
tclements@ksrh.com
 Parties Represented:
 Peter Kiritchenko

Evgeny Raschevsky Esq.
Anton Berezin Esq.
Egorov Puginsky Afanasiev & Partners
40/5 Bol. Ordynka Street
Moscow,   119017
Russia
Tel: +7 (495) 935-8010
Email: evgeny_raschevsky@epam.ru
anton_Berezin@epam.ru
 Parties Represented:
 Dastime Group Limited
 Konstantin Grigorishin

Mr. Alexander Lebedev
69 Chertanovskaya 66
Bld. 2
Moscow,
Russia
Email: NOT AVAILABLE
Parties Represented:
Moonvale Investments Limited

Mr. Dmitry Buryak
4-V Volodymyrskiy Uzvis
Ukraine,   01110
Ukraine
Email: NOT AVAILABLE
   Parties Represented:
   Moonvale Investments Limited

Aleksandr Gruzman Esq.
L/O Aleksandr Gruzman
7506 Jumilla Avenue
Winnetka, CA  91316
Tel: 818-590-6688
Email: agruzman07@gmail.com
   Parties Represented:
   Moonvale Investments Limited

     I declare under penalty of perjury the foregoing to be true and correct.  Executed at

San Francisco, CALIFORNIA on March 24, 2017.

Patricia M. Usak
pusak@jamsadr.com

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Moonvale Investments Limited vs. Dastime Group Limited, et al.
JAMS Reference No. 1100075691

I, Patricia M. Usak, not a party to the within action, hereby declare that on March 24, 2017, I

served the attached CORRECTED FINAL AWARD on the parties in the within action by Email and by

depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the

United States Mail, at San Francisco, CALIFORNIA, addressed as follows:

Neil A. Goteiner Esq.
C. Brandon Wisoff Esq.
Kelly M. Matayoshi Esq.
Farella Braun & Martel LLP
235 Montgomery Street
17th Floor
San Francisco, CA  94104
Tel: 415-954-4485
Email: ngoteiner@fbm.com
bwisoff@fbm.com
kmatayoshi@fbm.com
    Parties Represented:
    Dastime Group Limited
    Konstantin Grigorishin

Andrew Mac Esq.
EPAP USA PLLC
1700 H Street, NW
#62
Washington, DC  20006
Tel: 202-507-5762
Email: andrew_mac@epamusa.com
    Parties Represented:
    Dastime Group Limited
    Konstantin Grigorishin

Stan Roman Esq.
Tracy Clements Esq.
Keller Sloan Roman & Holland LLP
555 Montgomery Street
17th Floor
San Francisco, CA  94111
Tel: 415-249-8334
Email: sroman@ksrh.com
tclements@ksrh.com
    Parties Represented:
    Peter Kiritchenko

Evgeny Raschevsky Esq.
Anton Berezin Esq.
Egorov Puginsky Afanasiev & Partners
40/5 Bol. Ordynka Street
Moscow,   119017
Russia
Tel: +7 (495) 935-8010
Email: evgeny_raschevsky@epam.ru
anton_Berezin@epam.ru
    Parties Represented:
    Dastime Group Limited
    Konstantin Grigorishin

Mr. Alexander Lebedev
69 Chertanovskaya 66
Bld. 2
Moscow,
Russia
Email: NOT AVAILABLE
Parties Represented:
Moonvale Investments Limited

Mr. Dmitry Buryak
4-V Volodymyrskiy Uzvis
Ukraine,   01110
Ukraine
Email: NOT AVAILABLE
    Parties Represented:
    Moonvale Investments Limited

Aleksandr Gruzman Esq.
L/O Aleksandr Gruzman
7506 Jumilla Avenue
Winnetka, CA  91316
Tel: 818-590-6688
Email: agruzman07@gmail.com
    Parties Represented:
    Moonvale Investments Limited

    I declare under penalty of perjury the foregoing to be true and correct.  Executed at

San Francisco, CALIFORNIA on March 24, 2017.

Patricia M. Usak
pusak@jamsadr.com